MELVIN ELLIOTT AND M. F. ELLIOTT V. THE STATE,

No. 308.   Decided January 26, 1910.

Rehearing denied February 2, 1910.

#### 1.—Murder—Terms of District Court—Indictment—Special Term.

A special term of the District Court can be held, where the district is composed of more than one county, in an adjoining county of the one where the regular term of the District Court is in session, and the judge can recess the term of the court and proceed, while that term has not been finally adjourned, to hold a special term in an adjoining county of his district; and unless it be shown that the defendant tried during such a special term was injured in his legal rights, there is no error.

#### 2.—Same—Case Stated—Presiding Judge.

Where upon trial for murder it appeared from the record on appeal that the presiding judge of the District Court during the regular term of his court in one of the counties of his district ordered a special term of said court in another county of the district, appointed jury commissioners to select petit and grand juries and a special venire for said special term, and afterwards organized a grand jury who found the indictment against the defendants, set the case and tried the defendants; but during the organization of the jury commissioners, and while the grand jury was in session, returned to the regular term of his court and left the grand jury deliberating, and was absent a large portion of the time from the special term of the court, but presided at the trial of the case, and there being no injury shown to the defendants, there was no error, although he recessed the regular term of the court from time to time.

#### 3.—Same—Indictment—Motion in Arrest of Judgment.

Where upon trial for murder it appeared after conviction upon appeal that while the regular term of the court was being held in one of the counties of the district, the presiding district judge under the law ordered a special term of his court in another county of his district, appointed jury commissioners to draw petit and grand jurors, empaneled the grand jury who found the bill of indictment against the defendants, there was no ground to quash said indictment and no error in overruling a motion in arrest of judgment on the ground that the presiding judge was holding two courts at the same time; that he went to and fro between said courts, and absented himself for a week or more from the special court while the grand jury were deliberating upon the indictment, or because he set the case for trial and again returned to his regular court for several weeks and then returned to the special term of the court and tried the case before his regular term of court had finally adjourned; there appearing nothing of record that the defendants' rights had been injured thereby.

**4.—Same—Practice on Appeal—Sufficiency of the Evidence.**

Where upon an appeal from a conviction of murder the conviction was supported by the evidence, there was no error.

**5.—Same—Sufficiency of the Evidence—Special Charge Refused.**

Where upon appeal from a conviction of murder the evidence supported the verdict, there was no error in refusing a special instruction to acquit the defendant.

**6.—Same—Charge of Court—Several Defendants—Limiting Testimony.**

Where upon trial for murder against two defendants who were placed upon trial at the same time, the evidence showed that they acted together, there was no error in instructing the jury that the charge of the court with reference to the form of verdict, punishment, presumptions of innocence, reasonable doubt, and reasonable doubt between degrees of murder as well as to the principles of law, applied to both defendants; the court having previously charged the jury as to who were principals, and defined murder of the different degrees as well as manslaughter and self-defense.

**7.—Same—Evidence—Acts and Declarations of Defendants.**

Upon trial of murder of two defendants at the same time, where the evidence showed that they acted together in the homicide, there was no error to admit testimony that after the homicide the State's witness had a conversation with the defendants, and that one of the defendants stated in the presence and hearing of his codefendant to the witness that they had gone to the house of the deceased to see about a yearling, and also stated how deceased was shot, the defendants having denied that they went to the house of deceased for that purpose; and there was no error in the court's failure to limit this testimony in his charge to the jury, as this was a controverted fact for the jury.

Appeal from the District Court of Houston. Tried below before the Hon. B. H. Gardner.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary against each defendant.

The opinion states the case.

*Adams & Young,* for appellants.—On question of the court's failure to limit testimony: Crowell v. State, 56 Texas Crim. Rep., 480, 120 S. W. Rep., 897; Maloney v. State, 121 S. W. Rep., 728; O'Quinn v. State, 55 Texas Crim. Rep., 18; Gill v. State, 56 Texas Crim. Rep., 202, 119 S. W. Rep., 684.

*John A. Mobley,* Assistant Attorney-General, for the State.

McCORD, JUDGE.—The appellants were jointly indicted at a special term of the District Court of Houston County, charged with the murder of one R. C. Barbee, and they were at the same special term of said court put upon trial and convicted of murder in the second degree and the punishment of each assessed at twenty-five years in the penitentiary.

The evidence in brief is that on the morning of the 18th day of May, 1909, Melvin and M. F. Elliott left their home on horseback to go to the store of their brother Arch. That the deceased lived off of the road leading from the appellant's home to the store some 500 or 600 yards. Both the appellants were horseback, and appellant, Melvin

Elliott, was armed with a double-barreled shotgun; they arrived at the home of the deceased, Barbee, early in the morning between 6 and 7 o'clock; Barbee's family consisted of himself and three children, his oldest daughter some fourteen years of age and the next twelve and the other ten. When they rode up to the yard gate Barbee was standing out in the yard between his house and his lot, and the appellants asked him about a yearling—that is, Melvin Elliott asked him where the yearling was. Barbee said that was all right. They asked if it was in the pasture, and he said that was all right. Then Melvin told him if he went in the house that they would shoot him. He started to go in the house and Melvin shot him. Barbee was about eighteen or twenty feet from the house when shot. He had nothing in his hands. When the remark was made to him by Melvin about going into the house, the deceased raised his hands and said, "Shoot! shoot! you damned low-down cowards;" when Melvin shot deceased fell to his knees and Melvin shot him again and then rode off. This was the testimony of the witness Ewell Cutsworth, a boy about 15 years of age, and who was in the yard at the time of the shooting. Frank Cutsworth, a little boy 10 years old, states it practically like the other boy, and added that the Elliotts, after shooting, went off down the lane where the back gate was; that "Baby Child," one of the children of Barbee, then ran out and said, "Oh, you have killed my papa!" and the Elliotts went right down the lane towards the back gate, and when she said that they turned around and laughed. The little girl, Mamie Barbee, testified that she was in the kitchen at the time and heard two shots fired; that she paid but little attention to that and thought it was her father shooting a hawk, and when her little sister came running in and told her that Melvin Elliott had killed her father she ran out where he was and saw him lying on the ground, and she saw two men near the gate nearly ready to open the gate. This witness testified that at the time of the killing she was washing dishes in the kitchen; that her mother was dead and that she was the oldest child and was keeping house for her father. She says the gate was closed where they went out and the appellants did not have to get down off of their horses to open it. She stated that her father had a shotgun in the front room, the room next to the lot, where he was killed. Tina May Barbee testified that she was at home and was looking out of the window when the Elliotts rode up and they said good-morning, and her father answered good-morning, and then Melvin Elliott asked him where the yearling was; that her father replied, "in the pasture." The Elliotts then told him to go and get it out of there; that her father said he was not going to do it, that it was his. That Melvin Elliott told him that he would shoot him; that her father held up his hands and told him to shoot, and that he shot him; that he shot him twice. After the first shot and the deceased was falling backwards the Elliotts shot again and he fell to the ground. The witness says she holloed that they had killed her papa and they just laughed. They both laughed loud. May Dell Barbee testified to

the same thing. All of the witnesses, the Barbee children, together with the two Cutsworth, testified that the appellants, when they rode up, asked the deceased where the yearling was and demanded that he go and get it, and that he refused, and upon his refusal Melvin Elliott shot him down. Both of the appellants took the stand and testified that the deceased had been making remarks about them, and that on this particular morning they concluded they would go by as they were going on to the store of their brother and see Barbee about it and get him to desist from making the remarks; that the appellants had been informed that the deceased had stated that he had "raised us and tried to make something out of us and that he could not make anything out of us but a set of God-dam sons-of-bitches and thieves. We concluded that we would go and see him about it." They both claim that they rode up to the house and spoke to him in a civil manner, and when they called the deceased's attention to the remarks he had made he immediately began cursing them, and that the deceased started towards Melvin Elliott and then turned towards the house walking at a rapid gait; that Melvin Elliott asked him twice not to go in the house when the deceased replied: "I will not take anything back, you God-dam sons-of-bitches; I am going to kill you sons-of-bitches, and I will kill you both if you don't take it like it is;" that when he started to the house Melvin Elliott fired upon him and his horse wheeled; that he did not know when he shot the second time, and that his brother ran to the gate and threw it open and they ran out. The appellants testified further that they went after the doctor to get him to go over and find out how badly deceased was hurt, and that they did not hear the little girl say that they had killed her father. The gun was a 12-gauged double-barreled shotgun and was loaded with No. 6 squirrel shot. M. F. Elliott did not have any gun at the time and he and his brother Melvin both state that nothing was said or done by M. F. Elliott at the time of the shooting. They specially denied any agreement between themselves to hurt or harm the deceased, but that their mission in going there was to get him to stop talking about them. They denied positively that there was anything said about the yearling on the morning of the difficulty; that the yearling belonged to their brother, and as they understood it that matter had been settled; and that they had no interest in the yearling whatever. M. F. Elliott testified that he had nothing whatever to do with the killing; that he went with his brother; that he had started to the store to get some soda on that morning and he met his brother; that he knew that the appellant Melvin had a gun when he met him that morning and that it belonged to their brother Arch, and that Melvin was taking it home; that they went up to see deceased about his talk about them and that the killing was the result of the conversation about the language he had used; that he did not know the gun was loaded and knew nothing about it; that while they did not feel kindly towards the deceased, they were not mad enough to want to do him any harm; that Barbee lived off some 600 or 800

yards from the road that led from their home to the store; that he knew Barbee lived at home with his children, his wife being dead. He denied that they laughed when they started off after the killing; that they went for the doctor at once; that they went to their mother after they went for the doctor and got there about a half hour after the shooting. M. F. Elliott further testified that he, M. F. Elliott, was at his mother's when the two Bynum boys came, and that he did not hear any conversation between the Bynums or George Wilks and his brother Melvin about how the deceased was shot. This witness further testified that he did not hear his brother tell anyone, either the Bynums, Wilks or Scruggs, that when he went up to the house of the deceased that he asked the deceased about the yearling. The State placed Asa Bynum upon the stand and he testified as follows: "I was at Mrs. Elliott's house on the day Mr. Barbee was killed. Mel and Filmore Elliott were there, and I had a conversation with them in which Mel Elliott said that he and Filmore went up to Barbee's to see about getting a yearling." This is a sufficient statement of the facts to make plain the issues raised by the appellant in this case.

1. Appellant in the court below moved to quash the bill of indictment on the ground that it was found at a special term of the court; that the regular district judge, Hon. B. H. Gardner, was the qualified Judge for the 3d Judicial District, composed of the counties of Houston, Anderson and Henderson, and that the said Gardner, as judge, opened a regular term of the District Court of Anderson on April 26, 1909, and that the same remained in session until June 19, 1909, when it was closed by operation of law and that another regular term of said court of Anderson County was opened by said judge on the 21st of June, 1909, and that the same is now in session and has not been closed; that said judge came to Crockett, in said Houston County, on June 10, 1909, and opened said special session of court, and on said date appointed jury commissioners to select a petit and grand jury and special venire for said special term, and that after the jury commissioners made their report the said judge on June 11 returned to Palestine and remained out of said Houston County until June 16, 1909, when he returned to Crockett and empaneled the grand jury and on the same day returned to Palestine and remained out of said Houston County until the 25th day of June, 1909, when he again returned to Crockett; that said grand jury entered upon their labors and continued them until June 25, 1909, when said Judge returned to Crockett, when the indictment against this defendant was returned into court and was filed and the case set for trial July 20, 1909, and after receiving said report the said judge returned to Palestine and was not again in Houston County until July 19, 1909, and that while the said judge was absent from Crockett he was holding court in Anderson County, and that no other judge but said Gardner presided over said special term of court. This motion to quash the bill of indictment was by the court overruled and appellant took a bill of exceptions thereto. It is conceded

that the bill of exceptions contains a correct recital as to the courts pending in these different counties at that time. These questions were presented in the court below in the way of a motion to quash the indictment, a motion to set aside the indictment, and also a motion in arrest of judgment. They all contained the same proposition and involved this question: Whether a special term can be held in a district in one county during the time fixed by law when the regular term of the court is in session in an adjoining county of the same district, and whether the judge can recess one term of the court and proceed, while that term has not been finally adjourned, to hold a special term in an adjoining county of his district? If this question is answered in the negative, then the proceedings and trial in the court below was null and void and the case will have to be reversed and dismissed because the indictment was returned into a court that could not have had an existence and at a time not authorized by law. The question as here presented has not been before this court nor the Supreme Court, that is, the exact question. Questions similar to this have been before this and the Supreme Court and the reasoning of the courts in those cases, if extended, would, we think, apply to this case. In the case of McIntosh v. State, 56 Texas Crim. Rep., 134, 120 S. W. Rep., 455, this question was presented: Should the indictment have been quashed for the reason that the District Court was in session in Fannin County at the same time that the special term of court, under which appellant was sought to be convicted, was in session in Lamar County? And the contention was made in that case that the court could not be in session at two different places at the same time. This court, speaking through Judge Ramsey, says: "It is not to be denied, nor is it claimed that Hon. Ben H. Denton, the legally elected judge, was not present throughout the trial, or that any injury resulted from the fact, if it be a fact, that a District Court was being held in the adjoining county. It is not disclosed by the bill of exceptions whether the court at Bonham was in recess or not, but it is clear to us that if the legally elected district judge was sitting in Paris, Lamar County, Texas, under a valid law and under notice duly given, the appellant could not claim that he ought to have been somewhere else. Not only the Act above quoted permits, but the Constitution also authorizes special terms of court in such manner as may be provided by law, and the appellant is in no position to complain and claim the act of the grand jury indicting him was illegal because of the personality or the person occupying the district bench. He was the district judge, and the law empowered him to convene a special term of the District Court, and for that purpose he might, if he saw proper, adjourn another court at a different place in his district, or suspend the session of said court in such other county, or recess the court in order to hold a special term, if public necessity and the public good required it." We are not advised by the bill of exceptions as to what disposition was made of the court in Anderson County, whether it was adjourned or recessed, or

whether a special judge had been selected to conduct the business in the absence of the regular judge. If any rights of any litigant were jeopardized by the absence of the judge from Anderson County, or injury resulted to any litigant by such absence, then it might be said that these parties could complain. But here the law provides that the district judge, in case of an emergency, or necessity, might at any time call a special term of the court and the law does not provide that he shall adjourn the court that might be in session at the time he called the term in some other place. It only provides that he may call a special term of court when the business of a particular county demands it. Here was a term of court fixed by law; here was the judge of that district holding the court. How then could appellant complain that he was denied a trial according to law or that the proceedings were illegal? But it is contended that the district judge returned to Anderson county, after organizing the grand jury, and left the grand jury deliberating upon the finding of the indictment when the judge was absent from the county. How or in what manner he was injured by the absence of the judge we are not advised. We know, as part of the judicial history of Texas, that a judge sometimes leaves a county and leaves the grand jury in session. What we might hold, if the injury resulted to appellant by the absence of the judge, is not now before the court by any bill of exceptions presented. As said by the Supreme Court in the case of Munzesheimer & Klein v. Fairbanks & Co., 82 Texas, 351, and which has peculiar application in this case, it frequently happens that a special term can only be held in one county during the time that is fixed by law for holding in another county in the same district, and because the special term may conflict with the court in session in an adjoining county can not be a reason for invalidating the proceedings of that court, and the Supreme Court, speaking through Justice Henry, used this language: "The law provides that the judge who orders a special term 'shall appoint the time for the holding of such special term at a day not less than thirty days after the adjournment of the regular term at which such order is entered. . . .' Many of the judicial districts of this State consist of a number of counties. Upon the termination of a term in one county, one usually begins in another without an interval of time intervening, and unless the special term can be held while a court is being held in some other county of the district the law would be of but little practical effect, as in many counties it could have no operation." We, therefore, hold that the proceedings in the court below in the organization of the grand jury and the return of the bill of indictment, and the trial commenced thereon, was held at a term of court authorized by law; that the district judge of that district was present and presiding, and that the appellants can not be heard to complain that the district judge recessed another court to hold that term of court, and it not being shown how or in what manner appellants were injured thereby, we

hold that the court below correctly refused to quash the bill of indictment and correctly ruled on the motion in arrest of judgment.

2. There is no complaint in the motion for a new trial of the charge of the court insofar as the same relates to the appellant Melvin Elliott. The third ground of the motion is that the verdict of the jury is not supported by the evidence. It is sufficient to say that this ground of the motion is overruled.

3. The fourth ground of the motion for new trial is that the court erred in not limiting the evidence of statements made by Melvin Elliott after the killing as to his own acts, which evidence was objected to by appellant, M. F. Elliott, as evidence against him, and which evidence the court admitted, stating that he would qualify same in his charge to the jury. This ground will be considered in connection with appellant's bill of exceptions No. 4.

4. The fifth ground of the motion for new trial is that the court erred in not giving appellant's special charge to acquit appellant, M. F. Elliott, because the evidence is not sufficient to support the verdict. We do not think that the court below erred in refusing a new trial upon this ground.

5. The sixth ground of the motion for a new trial complains the court below erred.in its charge to the jury as to M. F. Elliott in saying: "So far as applicable, it governs in the case of M. F. Elliott, as well as in the case of Melvin Elliott, and this is so as to the forms of verdict and punishment," because said charge instructs the jury to give the same punishment to both defendants, and the jury so construed it as shown by their verdict. The charge given by the court is as follows: "You are instructed to consider the charge as a whole, and so far as applicable it governs in the case of M. F. Elliott, as well as to Melvin Elliott, and this is so as to the forms of verdict, and punishment, presumptions of innocence, reasonable doubt, and reasonable doubts between degrees as well as to the principles of law." The court had previously in a very clear manner explained to the jury who were principals, and had defined murder in its various degrees, as well as manslaughter and self-defense, and without repeating, when he came to apply the law to the facts of the case, he simply directed the jury that the punishment, form of verdict, reasonable doubt as had been defined to them as their guide in determining the guilt of Melvin Elliott would also apply to M. F. Elliott. We do not think there was any error in the instructions given by the court as to the rules that should govern the jury as to the form of verdict and punishment that they would inflict in case of conviction of M. F. Elliott. The charge is not subject to the criticism of counsel for appellants, that same was tantamount to an instruction to the jury to give the same punishment to both defendants.

6. We are now brought to the consideration of bill of exceptions No. 4, in which complaint is made that the court, over objections of appellant, erred in allowing the witnesses, Asa and S. T. Bynum, to

testify that in a conversation with appellants, Melvin and M. F. Elliott, appellant Melvin Elliott, at Mrs. Elliott's home on the day Barbee was killed and after he was killed, told said witnesses that he, appellant, Melvin Elliott, and his brother, M. F. Elliott, went to Barbee's house to see about a yearling, and also stated to said witnesses how deceased Barbee was shot. This evidence was objected to on the part of appellant, M. F. Elliott, because, first, that such conversation was after the death of Barbee, was a conversation between Melvin Elliott and the witness, and that what Melvin Elliott said was not admissible against the appellant, M. F. Elliott, and because anything that Melvin Elliott may have said in such conversation could not affect the appellant, M. F. Elliott, even if he were present and heard said conversation, all of which objections were overruled by the court, and said evidence admitted, the court remarking in his rulings that he would control said evidence in his charge. The court attached the following explanation to the bill of exceptions: "I did not limit said evidence because it appeared that the statement was made in a conversation between the witnesses with both defendants." Now, in order to make the testimony admissible, the appellant, M. F. Elliott, would not have had to engage in the conversation. If he was present and heard said conversation, he would be as much bound as his brother, Melvin Elliott, who made the declaration. It is true, Melvin Elliott denied that he heard this conversation, and we can not agree to the contention of appellant in this case that appellant, M. F. Elliott, would not be bound by the statement made by Melvin Elliott that they went to see deceased about a yearling. Both appellants denied specially that they went to ask about the yearling when they went up to the house, and that at the time of the killing nothing was said about a yearling. According to the State's contention, the appellants' theory that they went and demanded an explanation for some remarks that had been made by deceased about them, was manufactured and was gotten up after the killing, and that said remarks had nothing whatever to do with bringing about the difficulty that resulted in deceased's death. If the appellants did not say anything about the yearling when they went to see Barbee, and Melvin Elliott stated to the Bynums that he did ask about the yearling, and demanded that the deceased produce it, and the deceased refused, it strikes us it would call loudly for a denial on the part of M. F. Elliott if this was false. Hence, we think that the testimony would be admissible if said in the presence and hearing of M. F. Elliott not only against the appellant, Melvin Elliott, but also against M. F. Elliott. Now then, we come to the last proposition: Was the court called upon to limit this testimony in his charge to the jury simply because the appellant, M. F. Elliott, denied hearing the conversation? We think not. We have never yet understood the rule to be that the courts were called upon to limit and control testimony, on an issuable fact, of the controversy arising over the fact. The court is only called upon to limit testimony when the contradictory

or impeaching testimony can be appropriated by the jury for purposes other than impeachment, but the testimony here is not impeaching testimony. It was one of the circumstances in the case. It is always admissible and permissible in a case of murder to show the conduct and appearance and declarations of the defendant or accused party before the killing, his acts and conduct at the time of the killing, his subsequent conduct and declarations in regard to the killing. The issue was made before the jury by the State's testimony that the first words spoken by appellants, when they approached deceased at his home on that morning, were, "Where is that yearling?" The appellants deny this. It became an issue of fact in the case. The State was entitled to all the testimony pro and con, not only the declarations of the parties at the time of the homicide, but the declarations subsequent as to the purpose in going to the house of the deceased; and simply because the appellants got upon the stand and denied that Melvin Elliott made this statement to the witnesses as to what their purpose was in going to the house of the deceased, and the denial of hearing such a statement, does not present such a question as to demand from the trial court a charge to the jury that they would not consider said testimony unless the defendant heard it. The defendant might with equal propriety demand of the court below that he should limit the statement of the witnesses as to what Melvin Elliott stated to them and the jury directed not to consider same if the said Melvin Elliott did not make the statement. It was an issue in the case like any other fact to be passed upon by the jury. Neither the facts nor any known rule of law that we are aware of demanded of the court below a charge to the jury that they would not consider against M. F. Elliott the circumstance of the statement made by Melvin Elliott to the witnesses, unless M. F. Elliott heard that statement. We, therefore, hold that the court below was not called upon to limit this testimony, and that there is no merit in this ground of appellant's contention.

We have reviewed the testimony in the case, and are constrained to hold that the testimony amply supports the verdict, and that the judgment of the court below is in all things affirmed as to both appellants.

*Affirmed.*

[Rehearing denied February 2, 1910.—Reporter.]