### Ex parte Odette PORT.

### Ex parte Bernard PORT.

### No. 69306.

Court of Criminal Appeals of Texas, En Banc.

July 25, 1984.

Randy Schaffer, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and William J. Delmore, III, James Lavine and Bradley Beers, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PER CURIAM.

The Court granted leave to file this original application for writ of habeas corpus in order to determine whether applicants are being illegally restrained in their liberty on account of their respective refusals to answer certain questions propounded before a grand jury. See Article 20.15, V.A.C.C.P.

## FACTS

On June 8, 1984, seventeen year old David Isador Port was arrested and on the following day in Cause No. 404,955 he was charged by complaint with the offense of murder. Specifically that complaint alleged that in Harris County on or about June 7, 1984, Port did

"intentionally and knowingly cause the death of DEBRA SCHATZ, hereafter styled the Complainant, by shooting the Complainant with a firearm.

It is further presented that ... Port ... did then and there unlawfully intend to cause serious bodily injury to ... the Complainant, and did cause the death of the Complainant by intentionally and knowingly committing an act clearly dangerous to human life, namely, by shooting the Complainant with a firearm ..."

Bail was fixed and Port was released on bond signed by Bernard Port as cosurety June 9, 1984, conditioned that David appear before the 179th Judicial District Court of Harris County on June 11, 1984, for a "probable cause hearing."

Bernard Port is the natural father of David Isador Port; Odette Port is the wife of Bernard Port and the stepmother of David Isador Port. They were in the 179th Judicial District Court at the appointed day and time. Bernard Port and Odette Port were each served with a subpoena to appear at 11:00 a.m. that same day before the grand jury of the 176th Judicial District Court and to testify concerning the death of Debra Sue Schatz. An examining trial was set for June 22, 1984.

Applicants did appear as commanded, but invoked the privilege against selfincrimination with respect to answering questions concerning the death of Debra Sue Schatz and activities of their son David on or about June 7, 1984. To their refusal the State responded with a motion to compel

testimony and to grant use immunity. Upon a hearing the court granted the motion and ordered Bernard Port and Odette Port

> "to testify before the 176th Judicial District Court Grand Jury of Harris County, Texas, in regard to an investigation now being conducted by the Grand Jury into certain criminal acts alleged to have been committed on or about the 7th day of June, 1984, in Harris County, Texas, regarding the murder of Debra Sue Schatz and the conduct of David Isador Port. * * * " [1]

Subpoenas were again served, commanding the senior Ports to appear and testify before the grand jury June 15, 1984. However, on that day they filed a motion to quash subpoenas; a hearing on issues thus raised was set for June 18, 1984 and, abating the grand jury subpoenas, the judge ordered applicants to return to court that Monday morning.

The motion to quash asserted "a parent-child privilege which flows directly from the constitutional rights of freedom of religion and privacy" and further contended that the State was abusing the grand jury process in that "it intends to use the Grand Jury to gather evidence from the parents of the accused to assist the State in preparing to meet an anticipated insanity defense which might be asserted at trial," such being beyond "the scope of a legitimate Grand Jury investigation." The court convened a hearing on that motion and for the better part of Monday applicants adduced testimony and other evidence in support of their position. The judge rejected all contentions, denied the motion to quash and ordered applicants to testify before the grand jury instanter.[2]

Applicants again refused to answer questions put to them in the grand jury room, and the following morning another court hearing was held. The State presented a court reporter who had taken notes of the grand jury proceedings, particularly questioning of the Ports and their respective responses. She authenticated a transcription of selective parts of her notes and testified that to practically every question asked the response was the same, *viz:*

> "I respectfully decline to answer the question on the basis of the parent-child privilege as a matter of the exercise of my right to maintain family privacy. I also respectfully decline to answer in reliance on my Constitutional privilege against self-incrimination." [3]

The transcriptions of questions asked were marked as exhibits, and by agreement the judge ordered them sealed and thus made a part of the record. Tracing the brief history of events beginning June 11, the judge then admonished applicants about the consequences of their continued refusal to answer what he found to be "relevant and proper questions;" he drew from each a stated intention "to refuse at all times in the future" to answer them; pronounced that the court would enter an order to show cause why each applicant should not be held in contempt "for failure to comply with Article 20.15;" directed them to return that afternoon to receive a copy of the show cause order and set a hearing on the order.

In the afternoon, papers pertaining to each applicant, respectively, were transfer-

---

1. The balance of the order provided use immunity.

2. In pertinent part, the judge noted that testimony did not show a "religious obligation or duty" on the part of a parent to refuse to testify against a child; he empathized with a strong parent-child relationship and opined that such a privilege "probably should be the law," but found "that it is not the law." He thoughtfully concluded:

> "Now we've got whether the right of these parents is paramount to that of the best inter-

est of society and ... I can visualize that I would not want to live by my decision in this case in every instance but taking the totality of everything that I've had before me, I'm going to deny the motion to quash ..."

3. To one question Bernard Port merely answered, "On that I will take the Fifth Amendment." To another question Odette Port made substantially the usual rote response but added: "and on advice of counsel. He said it's beyond the scope, not within the scope of the Grand Jury."

red to separate files to which a particular cause number had been assigned by the clerk of the court, and a hearing on the orders to show cause was set for June 27. A copy of the order, along with a notice to show cause, was served on each applicant.

The order and notice alike recount developments leading to and justifying a command that applicant show cause why "you should not be held in contempt of the 176th Judicial District Court Grand Jury by failing to answer proper questions set forth [in sealed exhibit] and hereby made a part of this Order ..." Both were entered in the general minutes of the court June 19, 1984.[4]

Friday, June 22, 1984 in the 179th Judicial District Court Cause No. 404,955 came on for hearing, having been earlier set for examining trial. Attorney for David Isador Port presented a written "Waiver of Indictment and Entry of Plea of Not Guilty." Therein, over his signature and that of his counsel, David Port "hereby voluntarily waives in open court the right to be accused by an indictment in this non-capital felony case," "requests that he be charged by information and enters a plea of not guilty thereto." A transcription of the notes of the court reporter shows that counsel made representations to the same effect to the judge presiding, adding that David "is ready to personally enter a plea of not guilty if the Court desires to make inquiry of him." The judge then admonished David of his rights in the premises and obtained an express waiver freely and voluntarily made as to each one. Whereupon the judge stated, "The Court will accept the waiver," and indicated that the docket

sheet will reflect that David had been arraigned and entered a plea of not guilty—as indeed it does. The same assistant district attorneys in charge of the grand jury matters, appearing for the State, voiced no objection to the action of the court. Accordingly, an examining trial became moot and it was ordered dismissed; the cause was set for July 18, 1984.

On June 27, 1984, the day for hearing applicants' response to order to show cause why they should not be held in contempt, there were filed in the cause now assigned to each applicant an "AMENDED ORDER" to show cause and "NOTICE TO SHOW CAUSE" that was served the same day. The only "amendment" of note is that instead of directing that cause be shown "why you should not be held in contempt of the 176th Judicial District Court *Grand Jury*" the amended order required a showing "why you should not be held in contempt of the 176th Judicial District Court."[5] Moreover, the new notice commands that cause be shown "why you should not be held in contempt of the 176th Judicial District Court and punished therefore *pursuant to Article 20.15*, C.C.P."

At the hearing applicants proved up the June 22 proceedings in Cause No. 404,955 in the 179th Judicial District Court and, without objection, introduced written waiver of indictment and entry of plea of not guilty, as well as the docket sheet containing an entry for June 22 that "Defendant duly arraigned according to law. In open court pleaded not guilty. Defendant waived indictment."[6] In oral argument counsel for applicants reurged contentions

---

**4.** Curiously, we find in the record yet another "Order to Show Cause Hearing for Contempt" naming each applicant. Unlike the specially drafted one described in the text above, however, this form order directs applicant to show cause for not being held "in contempt of this Court for failing to follow the Court's order" and in a blank space someone has written "failure to testify before 176th Grand Jury." It, too, appears to have been entered in the general minutes of the court June 19, 1984, but we see no indication that it was served.

**5.** Since the identical phrase appears twice in each amended order and again in the incorpora-

tion of the order in notice to show cause, the deletion was surely intentional. (All emphasis is added by the writer of this opinion unless otherwise indicated.)

**6.** July 3, 1984, the judge of the 179th Judicial District Court entered a written order that noted the June 22 proceedings but ordered that the records be corrected "to indicate that *NO* felony information has been filed in the above numbered and entitled cause and no duly authorized arraignment has been made as of this date." (Emphasis in original.)

previously made and, additionally, submitted that their appearance before the grand jury had been rendered moot by reason of the June 22 proceedings in the 179th Judicial District Court. On this latter point the State contended that waiver of an indictment "is simply not sufficient to preclude the Grand Jury from hearing such evidence and testimony" that might show commission of greater offenses of capital murder or lesser offenses of murder; relying on *King v. State*, 473 S.W.2d 43, at 50 (Tex.Cr.App.1971), the prosecutor asserted, "The State is not agreeing to utilize a waiver of indictment in this case ... and elects and chooses not to proceed on information ..." The judge found that applicants "have failed to show cause why they should not be held in contempt of Court and accordingly this Court holds that both [applicants] are each guilty of contempt of Court ..." Therefore, the court assessed punishment at a fine of five hundred dollars and remanded each to jail to the custody of the Sheriff of Harris County "until such time as they may purge themselves to such contempt."

In the record are two sets of two orders, one set naming an applicant and the second naming the other applicant. In common in both sets is a "Judgment of Contempt," each bearing a file mark dated June 27, 1984 with a time of 10:00 A.M. written in and then signed by a deputy clerk. However, across the whole file mark has been written "canceled." There is also in common a paper titled "Court's Order and Judgment in Contempt Action," dated June 27, 1984, and appearing to bear the signature of the judge presiding. There is a notation of entry in minutes of the trial court. Moreover, this order and judgment find each applicant "was guilty of misbehavior in the immediate view and presence of the said Court ... in failing to follow the Court's order ... to testify before the Grand Jury of the 176th Judicial District Court, said act impeding and obstructing the Court in the administration of justice." Therefore, it is ordered and adjudged that applicant is guilty of contempt and a fine of five hundred dollars and costs of twenty nine dollars are assessed. There is no men-

tion of contemnor remaining in confinement until willing to testify.

Finally, there is a commitment in each cause issued over the signature of the same deputy clerk alluded to above; it is also dated June 27 and bears a date and time stamp of even day at 10:25 a.m., signed by a different deputy clerk. Each commitment recites that applicant is remanded to the Sheriff until applicant purges of contempt and testifies before the 176th Grand Jury, and $500 fine.

## REMAND TO CUSTODY

■ From those facts of the matters before this Court, one legal conclusion is immediately apparent. Though the one part of each order of commitment purports to remand applicant to the Sheriff until applicant purges of contempt and testifies before the grand jury, there is no viable order authorizing the issuance of such a commitment. As has been pointed out, the file mark of the tailormade "Judgment of Contempt" was canceled, leaving only the completed form "Court's Order and Judgment in Contempt Action," see *ante*. However, the latter just imposes a fine; it neither orders that applicant be remanded to the Sheriff until applicant purges of contempt and testifies before the grand jury nor directs the clerk to issue a commitment to that effect. The order is what controls. *Ex parte Sentell*, 153 Tex. 252, 266 S.W.2d 365, 370 (1954). The part of each commitment purporting to remand each applicant to the Sheriff until applicant purges of contempt and testifies before the grand jury is unauthorized. *Ex parte Arledge*, 463 S.W.2d 29, 31–32 (Tex.Civ.App.—Texarkana 1971).

Accordingly, for these reasons alone applicants are entitled to relief from that part of the commitments that purport to remand them to the custody of the Sheriff until willing to testify.

## FINE

■ We now turn to the matter of the five hundred dollar fine that is assessed in the form "Court's Order and Judgment in

Contempt Action" and is mentioned in each commitment. However, the order and judgment does not purport to remand applicant to the custody of the Sheriff until the fine is paid, nor does it direct the clerk of the court to issue a commitment to that effect. Upon the authorities just cited above with respect remanding applicant until purges of contempt, each applicant is entitled to relief from further restraint under the commitment.

## CONTEMPTUOUS CONDUCT

██ Proceedings below and papers in the record have been expansively described in order to lay a predicate for several observations that are pertinent now that Article 20.15 contempt is in vogue, and for the findings that follow. But, we pretermit a discussion of threshold matters such as direct and constructive contempt, civil and criminal contempt and the like for, though aspects of one or the other may be implicated, and there are analogues, the kind of contempt declared by Article 20.15 is more or less sui generis. *Ex parte Wilkinson v. State*, 641 S.W.2d 927, 932 (Tex.Cr.App. 1982).

In the first place, Article 20.15 is found and always has been in a code of criminal procedure chapter dealing with "Duties and Powers of the Grand Jury." Initially then, we turn to examine the nature of that creature of our Constitution that is the grand jury.

Essential functions of a grand jury are to "inquire into all offenses liable to indictment of which any member may have knowledge, or of which they shall be informed by the attorney representing the state, or any other credible person," Article 20.09, V.A.C.C.P., and when "all the testimony which is accessible to the grand jury shall have been given in respect to any criminal accusation, [to take a vote] as to the presentment of an indictment ...," Article 20.19, *Id.* But constitutionally the grand jury exists as an institution to ensure that "no person shall be held to answer for criminal offense, unless on an indictment of a grand jury" with certain limited exceptions, Article I, § 10, Constitution of the State of Texas; statutorily, "No person shall be held to answer for a felony unless on indictment of a grand jury," Article 1.05, V.A.C.C.P. The reason comes from the common law and is, of course, "to protect an individual against unjust prosecution without sufficient cause," Interpretive Commentary to § 10, supra, or against "the still greater peril of a sacrifice to a public clamor," *King v. State*, 473 S.W.2d 43, 45 (Tex.Cr.App.1971).

██ Other features of a grand jury are constitutionally provided, making it a distinct entity in our criminal justice system, Article V §§ 13, 17. Naturally the Legislature must implement those constitutional provisions by providing for organization, powers and duties of any given grand jury, and it has done that, mainly in Chapters Nineteen and Twenty of the Code of Criminal Procedure. Thus, ultimately impaneled is a grand jury of twelve qualified jurors from an array selected either by grand jury commissioners appointed by a district judge, or by a district judge in the same manner for selection and summons of panels in civil cases. Articles 19.01–19.26, V.A.C.C.P. Though the judge appoints a foreman, may appoint a bailiff (as also may the district attorney) to attend upon the grand jury and instructs it as to their duties, Articles 19.34–19.39, *id.*, once organized, the grand jury retires to a suitable place prepared by the Sheriff and proceeds to discharge their duties in secret deliberations, Articles 20.01 and 20.02,[7] *id.;* the attorney representing the State is entitled to go before the grand jury to inform of offenses and may examine witnesses, or the grand jury may send for the State's attorney to obtain advice, Articles 20.03–20.05, *id.;* the grand jury may also seek and receive advice from the court, taking care that secrecy not be breached, in the manner provided by Article 20.06, *id.;* the foreman presides over its sessions and con-

---

7. It is of no moment that during deliberations of the grand jury the district judge absents himself to go to another county in the judicial district. *Elliott v. State*, 58 Tex.Cr.R. 200, 125 S.W. 568, 570–572 (1910).

ducts its business in an orderly manner, but the grand jurors decide when they will meet and adjourn, needing leave of court for more than three days, Articles 20.07 and 20.08, *id.;* the foreman, as well as State's attorney, may issue process for witnesses to be served by its bailiff or other officer, and any witness willfully evading process may be fined by the court, "as for contempt," Articles 20.10–20.14, *id.;* the foreman administers or causes to be administered oaths to witnesses before seeking answers to questions propounded to a suspect, an accused or a witness, by grand jurors, Articles 20.16–20.18,[8] *id.;* after grand jurors hear all available testimony and privately deliberate, if nine members concur in finding a true bill, the foreman makes up a memorandum such that will enable the attorney representing the State to write an indictment, Article 20.19, *id.,* and the attorney then expeditiously prepares all indictments which have been found and delivers them to the foreman for signing the same officially, 20.20, *id.;* at least nine members must deliver through their foreman each indictment ready to be presented, to the judge or clerk of the court, and that fact is entered upon minutes of the court, Articles 20.21 and 20.22.

▮ In sum, a duly impaneled grand jury is "a legally constituted ... governmental agency," *Ex parte Kennedy,* 116 Tex.Cr.R. 118, 33 S.W.2d 443 (1930), "a separate tribunal," *Barnes v. State,* 134 Tex.Cr.R. 461, 116 S.W.2d 408, 409 (1938); *Rodgers v. Taylor County,* 368 S.W.2d 794, 796 (Tex.Civ.App.—Eastland, 1963, writ ref'd n.r.e.), the members of which in secret deliberations alone determine competency and sufficiency of testimony for it to return an indictment, *Barnes v. State,* supra, at 409; courts will not go behind actions of a grand jury to determine whether sufficient evidence existed to justify return of an indictment, *Tarpley v. State,* 565 S.W.2d 525, 532 (Tex.Cr.App.1978). Such is the separate and independent nature of that tribunal the common law came to call, our colonist forebearers did and our Constitu-

tions still do, the grand jury. See Interpretive Commentary following Article V, § 13.

Secondly, with all that in mind, we now analyze the jurisdiction, power and authority of a district judge who has impaneled a grand jury before which a witness has refused to answer one or more questions propounded by someone authorized to ask it.

▮ Constitutionally the district court is granted *inter alia* "original jurisdiction in all criminal cases of the grade of felony ... [and] of all misdemeanors involving official misconduct ..." See also Article 4.05, V.A.C.C.P. Such is its subject matter jurisdiction. *Garcia v. Dial,* 596 S.W.2d 524, 527 (Tex.Cr.App.1980). Though constitutionally a "conservator of the peace," Article V, § 11, and possessing certain common law capacities, a judge *qua* district judge is without power or authority to perform any judicial act within the subject matter jurisdiction granted the district court over which he presides—unless and until that jurisdiction is properly invoked in a criminal case by valid indictment or information upon waiver of indictment, or in some other manner validly provided by statute. *Garcia v. Dial,* supra, at 527. In short, without more, neither district judge nor district court may acquire jurisdiction over the person of one who happens to appear in the courtroom. *Ibid.; Lackey v. State,* 574 S.W.2d 97 (Tex.Cr.App.1978).

▮ It follows that neither district judge nor district court may punish for contempt one appearing in the courtroom before jurisdiction, power or authority has been properly invoked or is then being exercised pursuant to some valid statutory or common law provision. That is, to state it extremely, a person is not subject to being held in contempt of court on the simple circumstance that while in a courtroom he is asked a question but declines to answer it. No judge has "general 'authority' to order [anyone] to answer questions" merely because they are asked in a courtroom.

---

8. Any communication made to the grand jury in the regular performance of its duties is "absolutely privileged," *Hott v. Yarborough,* 112 Tex.

179, 245 S.W. 676, 678 (Comm.App.1922, opinion adopted); *Quarles v. State,* 385 S.W.2d 395, 397 (Tex.Cr.App.1964).

*Ex parte Wilkinson,* 641 S.W.2d 927, 934 (Tex.Cr.App.1982) (Concurring Opinion). There must be a basis in law for putting the question and for a corollary obligation that it be answered.

So it is that when subject matter jurisdiction of the district court has *not* been invoked at all in a criminal case by indictment of, or information after waiver of indictment by, an accused, a district judge must look elsewhere for power and authority to require one to answer a question. Where a witness has refused to answer a proper question propounded before a grand jury, this Court has held that such power and authority are found in Article 20.15, supra—and nowhere else. *Ex parte Wilkinson,* supra, at 932–933.

■■■ Thirdly, such power and authority to require an answer and to punish for refusal to give it being derived from Article 20.15, means that finding questions propounded by the grand jury are proper and compelling the witness to answer by imposing a fine and committing the party to jail until willing to testify are in aid of the investigation conducted by the grand jury. Holding the recalcitrant witness in contempt and ordering confinement until willing to testify "is evidently for the sole purpose of procuring answers to particular questions propounded by the grand jury before which they have been called to testify." *Ex parte Jackson,* 95 Tex.Cr.R. 200, 253 S.W. 287, 288 (1923), "If relator upon being brought before the court in the first instance had averred his willingness to answer to the judge, but not to the grand jury, it would have availed him nothing." *Id.,* at 289. Thus, if contempt be found, it is of the grand jury not of the district court or district judge. *Ex parte Wilkinson,* supra, at 933–934 and n. 1. That rationale explains why in order to purge of contempt the contemnor must be willing to testify before and answer questions propounded by someone authorized by the grand jury, and further why when the offended grand jury adjourns at the end of its term the contempt matter becomes moot and a confined contemnor must be discharged from

custody. *Ex parte Moorehouse,* 614 S.W.2d 450, 452 (Tex.Cr.App.1981); *Ex parte Rodriguez,* 629 S.W.2d 757, 759 (Tex. Cr.App.1982); *Ex parte Shorthouse,* 640 S.W.2d 924, 927 (Tex.Cr.App.1982); *Ex parte Jackson,* supra, 253 S.W., at 289 ("the grand jury having adjourned, the commitment for refusal to answer such questions became functus officio ...").

Returning to the form "Court's Order and Judgment in Contempt Action," we reiterate its recitation that on June 27, 1984 while the court was transacting its regular business, hearing and determining causes pending before it, applicant was "guilty of misbehavior in the immediate view and presence of said Court in failing to follow the Court's order <u>in failing to testify before the Grand Jury of the 176th District Court</u> said act impeding and obstructing the Court in the administration of justice;" [9] the order then adjudges that applicant "by reason of said act was and is guilty of contempt of the authority of this Court, committed in its presence" June 27, 1984, and perforce orders that a fine of $500 and $29 costs be assessed against applicant.

■■■ That order and judgment conforms to the theory of the AMENDED ORDER and NOTICE TO SHOW CAUSE served on the day of the June 27, 1984 hearing. See *ante,* at p. 775. That is, that a refusal of a witness to answer a proper question propounded before a grand jury is "contempt" of the district court, the judge of which impaneled members of the grand jury at the outset, rather than the grand jury itself. It has been demonstrated *ante,* that such theory is erroneous; therefore, an order or judgment punishing a recalcitrant grand jury witness for contempt of the district court is not authorized by Article 20.15. The opinion of the Court in *Ex parte Wilkinson,* supra, made clear an appearance before the district court after refusal to answer proper questions by a witness who had been granted immunity in the premises "was not a distinct and separate proceeding, but was assistance to the

---

**9.** The underscored clause has been written on     the form.

grand jury as envisioned by Article 20.15, supra," *Id.*, at 933.

For these reasons as well each applicant is entitled to relief.

## CONCLUSION

The applicants are entitled to the relief prayed for and are discharged from the orders assessing a fine of five hundred dollars and remanding them to the Sheriff until willing to testify for the grand jury and from commitments purportedly issued pursuant thereto.

It is so ordered.

ONION, P.J., and W.C. DAVIS, J., concur in result.

ODOM, McCORMICK and CAMPBELL, JJ., not participating.