**Barbara Mock DIEHL & Raymond Charles Diehl, Appellants,**

v.

**The STATE of Texas, Appellee.**

**No. 01–84–0560–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 19, 1985.

Rehearing Denied Nov. 7, 1985.

Michael Echevarria, Angleton, for appellants.

Jim Mapel, Dist. Atty. of Brazoria County, Jim Turner, Asst. Dist. Atty. of Brazoria County, Angleton, for appellee.

Before WARREN, DUGGAN and LEVY, JJ.

OPINION

WARREN, Justice.

The trial court convicted appellants of possession of marijuana and assessed each appellant's punishment at 10 years probation. In their sole ground of error on appeal, appellants allege that the trial court erred in refusing to grant their motion to suppress the evidence. Appellants argue that the search warrant was based on an affidavit which did not show probable cause.

■ The affidavit on which the search warrant was issued reads, in pertinent part, as follows:

The undersigned Affiant, being a Peace Officer under the laws of Texas and being duly sworn, on oath makes the following statements and accusations:

1. THERE IS IN BRAZORIA COUNTY, TEXAS, A SUSPECTED PLACE AND PREMISES DESCRIBED AND LOCATED AS FOLLOWS: One story brick family dwelling, red with brown trim, located at Rt 8, Box 61 county road 948 Alvin, Brazoria County, Texas, approximately 150 feet east of intersection with county Rd. 99 on the south side of County Rd. 948 and out buildings and vehicles & trailers at said premises.

2. THERE IS AT SAID SUSPECTED PLACE AND PREMISES PROPERTY CONCEALED AND KEPT IN VIOLATION OF THE LAWS OF TEXAS AND DESCRIBED AS FOLLOWS: Marijuana plants and harvested marijuana

3. SAID SUSPECTED PLACE AND PREMISES ARE IN CHARGE OF AND CONTROLLED BY EACH OF THE FOLLOWING PERSONS: Brabara [sic] and Raymond Charles Diehl

4. IT IS THE BELIEF OF AFFIANT, AND HE [sic] HEREBY CHARGES AND ACCUSES, THAT: Barbara and Raymond Diehl, untentionally [sic] and knowling [sic] possess a usable quantity of marijuana in excess of four ounces

5. AFFIANT HAS PROBABLE CAUSE FOR SAID BELIEF BY REASON OF THE FOLLOWING FACTS: That she is a juvenile officer with the Brazoria County Sheriffs Department and has reason to believe based upon the information given to her by J____ R____, age 11, the natural child of Barbara Diehl, who resides at the above residence, that on December 14, 1983 [the same day] she observed a usable amount of marijuana at the above residence. Affiant has reason to believe that the information is creditable [sic] for the following reasons: the information given by J____ R____ concernin [sic] the growing, cultivation, and harvesting of marijuana was of such a specific and detailed nature that it could only be given by someone who observed it. Said information had been previously given to Terry Hernandez, principal of Manvel Junior High School and was repeated to Affiant by J____ R____ in Terry Hernandez [sic] presence. Affiant has been a juvenile officer for four years and in her capacity has had the occassion [sic] to interview juveniles on numerous occassions [sic] and based upon her experience and the information given and the testimony of J____ R____ believes the information is true and correct.

Appellant argues that the affidavit is not sufficient to show probable cause for several reasons:

1) The informant is 11 years old, she had never given information to the police before, she did not make a sworn statement to the police, and there is no indication to as why the affiant found her information credible or reliable;

2) There is no indication of any independent police investigation to corroborate any details of the informant's information;

3) There is no indication that the informant was capable of recognizing marijuana;

4) No specific details describing the marijuana or its possession are provided in the affidavit, and the conclusory statement that the informant's descriptions to the affidavit "could only be given by someone who observed it" was not sufficient to show facts upon which a finding of probable cause could be made.

We must determine whether the magistrate issuing the warrant in the instant case had a substantial reason for concluding that probable cause existed to believe that marijuana would be found at appellants' house. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates*, the U.S. Supreme Court said the following:

The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supply-

ing hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. 103 S.Ct. at 2332. Texas has followed the "totality of the circumstances" analysis of *Gates* in *Hennessy v. State*, 660 S.W.2d 87 (Tex.Crim.App.1983). Our question is whether a reasonable, prudent, and detached magistrate could read the affidavit in the instant case and believe that a crime was probably being committed by the persons and at the place named in the affidavit.

The state argues that the affidavit was sufficient to allow the magistrate to find probable cause by inferring from the facts given that the marijuana described by the informant was a usable quantity, that the informant had an opportunity to view the marijuana because of her relationship to appellants, that the informant was able to recognize the marijuana because she had been educated about it by appellants, and that the officer was capable of evaluating the informant's reliability and veracity by virtue of her training.

According to the provisions of Tex.Code Crim.P.Ann. art. 18.04(2) (Vernon 1977), a search warrant must "identify, as near as may be, that which is to be seized and name or describe, as near as may be, the person, place, or thing to be searched." In the instant case, the alleged place of the offense is described in painstaking detail in the affidavit. The persons named are the mother and step-father of the named informant, so there is little chance of confusion or mistaken identity. The illegal drug is specifically named: marijuana plants and harvested marijuana, rather than merely "drugs" or "powder" or "substances believed to be narcotics." The named informant allegedly saw the marijuana on the same day the affidavit and warrant were executed, rather than at some vague time in the past.

Appellants insist, however, that because the officer in the instant case did not relate in her affidavit the details of the information given to her by the informant, but instead merely described that information as convincing and concluded that the informant was telling the truth, the affidavit could not give the magistrate sufficient facts to support a finding of probable cause. A search warrant must contain "sufficient facts ... to satisfy the issuing magistrate that probable cause does in fact exist for its issuance." Tex.Code Crim.P. Ann. art. 18.01(b) (Vernon Supp.1985). The purpose of an affidavit underlying a search warrant is to give an independent magistrate all of the information available so that he may make the determination of whether probable cause exists to issue a search warrant. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Appellant argues that the officer in the case at bar preempted that process by judging the information for herself rather than giving it to the magistrate. A magistrate is not entitled to merely ratify the conclusions of the officer without having sufficient information on which to base his judgment. *Gates*, 103 S.Ct. at 2332. However, we hold that the affidavit did contain sufficient factual information to give the magistrate probable cause to issue the search warrant.

The informant in the affidavit was named, so that there was no need to indicate why her information was believable. She lived at the residence to be searched, so that her ability to observe the contraband was not at issue. We also note that growing marijuana, unlike processed drugs, is easily recognizable, both by its distinctive leaves and odor, and by the secrecy with which it is normally grown and processed. The informant's detailed descriptions given to the affiant would have given the magistrate even more reason to believe that probable cause existed to issue the warrant, but the omission of this information from the affidavit was not fatal. We hold that the trial court did not err in refusing to grant appellants' motion to suppress.

Appellants' ground of error is overruled, and the judgment of the trial court is affirmed.

LEVY, Justice, dissenting.

On two serious questions, I disagree with the majority.

## PART ONE

### *The Search Warrant*

I cannot agree that the police officer's affidavit contained "sufficient factual information to give the magistrate probable cause to issue the search warrant."

It is elementary that in passing on the validity of a warrant, the reviewing court may consider only the information brought to the magistrate's attention. What Henrietta Milstead, the juvenile investigator with the Brazoria County Sheriff's Department, *might* have had by way of additional information, is of no consequence. *See Aguilar v. Texas*, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964). The record reveals that Mrs. Milstead spoke with the informant, the 11-year-old child of Barbara Diehl, for "a little over an hour," and that Milstead made no independent investigation whatever to corroborate the tip: she did *not* check school records to determine whether either the child or the appellants lived at the address described in the search warrant, nor whether the appellants were in fact the child's parents or guardians, nor did she interview any of the other students or teachers to determine the informant's reputation for truth and veracity, or check to see if the informant had a juvenile record, nor did she talk with the informant's 14-year-old sister to verify the informant's accusations.

Milstead admitted that she would not have gone to the appellants' home without a search warrant because she did not think that, in the absence of such warrant, she had probable cause to search for the marijuana. In her affidavit, upon which the magistrate issued his search warrant, she described her information as credible because:

the information given by [the child] concernin [sic] the growing, cultivation, and harvesting of marijuana was of such a specific and detailed nature that it could only be given by someone who observed it.... Affiant has been a juvenile officer for four years and in her capacity has had the occassion [sic] to interview juveniles on numerous occassions [sic] and based upon her experience and the information given and the testimony of [the child] believes the information is true and correct.

An affidavit must provide the magistrate with a *substantial* basis for determining the existence of probable cause, and the wholly conclusory statements of officer Milstead simply failed to meet this requirement. These conclusory statements gave the magistrate virtually no basis at all for making an independent judgment regarding probable cause.

The question at issue, then, is whether the magistrate could credit this affidavit without abdicating his constitutional function. The constitutional requirement of probable cause, though it can be satisfied by hearsay information, must be determined by a "neutral and detached magistrate," and not by "the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), heavily relied on by the majority, the Supreme Court admonished that its decisions applying the "totality of circumstances" analysis "have consistently recognized the value of corroboration of details of an informant's tip by independent police work.... [A]n affidavit relying on hearsay is not to be deemed insufficient on that score, *so long as a substantial basis for crediting the hearsay is presented." Id.* at 2334. (emphasis added). And the Court further warned against the magistrate "rubber stamping" the police investigations by ignoring his constitutional obligation to make an *independent* determination:

Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action can-

not be a mere ratification of the bare conclusions of others.

*Id.* at 2332.[1]

It would indeed be difficult to conjure up a more appropriate subject for the Supreme Court's admonitions than the case at bar. Here, the search warrant affidavit is predicated upon the hearsay information of a first-time informant who is 11 years old and completely unknown to the affiant before the events in question. Although the affiant swore that her 11 year old informant was reliable, she offered the magistrate no reason or prior experience in support of this conclusion. The affiant testified, for example, that the child had told the school principal, Terri Hernandez, that she and her sister were forced to smoke marijuana, but when the child was questioned by the affiant, the child denied making such an accusation. Certainly this example shows the fanciful imagination, and the propensity to dramatize, that are so characteristic of a child this age, which should have alerted the affiant to conduct an independent police investigation to verify the facts. Perhaps even more important is the fact that the affiant does not give a sufficient statement in the affidavit of the underlying circumstances from which the informant concluded that her mother and stepfather were illegally growing or possessing marijuana. Nothing in the affidavit or the warrant indicates how the child knew what marijuana was or how she could identify it. It does not mention any expertise the affiant herself might have had in identifying marijuana. The affidavit is, therefore, seriously lacking in the *specific* facts necessary to justify the magistrate in issuing a warrant. The Supreme Court has held that "... [t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry v. Ohio,* 392 U.S. 1, 21 n. 18, 88 S.Ct. 1868, 1880 n. 18, 20 L.Ed.2d 889 (1968). I do not say that the information was so insubstantial that it could not have properly counted in the magistrate's determination, but rather that it needed much further and more specific support.

Under these circumstances, the reviewing court must keep in mind that simple good faith on the part of the officer is not enough to justify intrusions upon constitutionally guaranteed rights. Recently, the Supreme Court modified this principle: the exclusionary rule need not be applied if a police officer relies in good faith (the burden of proving "good faith" remains with the State) on a magistrate's acceptance of his affidavit, even if the magistrate's determination of probable cause is later found to be wrong. *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 3423, 82 L.Ed.2d 677 (1984). An officer, of course, is not authorized to question the magistrate's determination of probable cause after the warrant issues. If subjective good faith alone were the test, Fourth Amendment protections against unreasonable search and seizure would evaporate, and the people would be "secure in their persons, houses, papers, and effects" only in the discretion of the police. *Beck v. Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964). "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific Railway v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891).

It appears trite, but perhaps necessary, to repeat here that a search is not to be validated by what it turns up. In law, it is good or bad ab initio and does not change character from its success. Or, in the words of Mr. Justice Frankfurter, "Vindicated anticipation of what an illegal search may reveal does not validate a search otherwise illegal." *Lustig v. United States,* 338 U.S. 74, 80, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949).

---

**1.** The Court of Criminal Appeals has applied the "totality of circumstances" analysis in *Hennessy v. State,* 660 S.W.2d 87 (Tex.Crim.App.1983), and noted that the informant's detailed information "was substantially corroborated by independent police investigation." *Id.* at 91.

Although I realize that affidavits of probable cause are tested by much less rigorous standards than those governing admissibility of evidence at trial, *McCray v. Illinois*, 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967), and that the determination of probable cause by issuing magistrates should be paid considerable deference by reviewing courts, I am satisfied that this search warrant is so lacking in indicia of probable cause that it could not be sustained "without seriously diluting important safeguards that assure that the judgment of a disinterested judicial officer will interpose itself between the police and the citizenry." *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

## PART TWO

### *The Parent-Child Privilege*

I am not willing, as the majority apparently is, to bypass so readily, or in fact to ignore, the presence and significance of the parent-child relationship in criminal prosecutions. That relationship, and its significance, are not mentioned at all in the court's discussion. Because of this, and the paucity of case law on the subject, I must assume that in the majority's view the parent-child privilege is simply nonexistent in legal contemplation, or of little or no consequence in determining whether the motion to suppress should have been sustained.

With this conclusion I disagree and would hold that the motion to suppress should have been granted. We should not ignore the case law, scarce as it may be, emphasizing the significance of the family and expanding the realm of constitutional protection we accord the private sanctuary of family life. Nor should we ignore the social interest in preserving family units and the confidential exchange of information within them. If we are indifferent to such values and interests, it will be at the immediate risk of allowing the growth of State hostility to them. In contrast to the majority's apparent position, I feel that it is necessary to face the relationship issue squarely in order to reach a just and salutary result in this case, because the most serious, intimate, and far-reaching social values are in conflict here, involving the very nature of the relationships between the individual, the family, and the State.[2]

At the outset, it must be observed that appellants did not invoke the parent-child privilege as the basis for their timely filed motion to suppress, but rather alleged generally the lack of probable cause, which was discussed in PART ONE of this opinion. Appellants' failure to raise this issue is not dispositive, given the bereft state of the law on parent-child immunity in Texas; it was not, in other words, a *conscious* waiver in the sense of an "intentional relinquishment or abandonment of a *known* right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Because of the constitutional stature and transcendent social significance of this privilege, I would hold that the trial court's failure to grant appellant's motion to suppress was fundamental error.

Our Texas jurisprudence, like that of many other States, has a gaping hole where some protection of intrafamilial relationships should be. This void is all the more shocking and conspicuous because, not being based upon any specific judicial repudiation of a parent-child privilege, it is so incompatible with our nation's traditions, values, and conscience. It is not too rhetorical to assess the integrity and inviolability of the family unit—and the loyalty, trust, and confidence that normally exist within the parent-child relationship—as "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). The family unit itself has been afforded a right of privacy by the United States Supreme Court, and thus is eligible for protection from harmful intrusion by

2.  For an innovative and stimulating discussion of this problem, see S. Levinson, *Testimonial Privileges and the Preferences of Friendship*, 1984 Duke L.J. 631.

the State that violates that right. *See Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). Does a parent-child privilege, formulated to protect a relationship our whole history and traditions have deemed socially desirable, outweigh the compelling State interest in full disclosure of relevant facts? Is the State's invasion of the privacy of the family relationship too high a price to pay for the possible benefits of compelled disclosure?

A meaningful discussion of this problem would necessarily include the origin of the right of privacy. Although not explicitly mentioned in our federal Constitution, it apparently derives from "the penumbra of (other) constitutional rights" specifically enumerated, *Griswold v. State*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and received its early and classic expression in the words of Justice Louis D. Brandeis:

> The framers of the constitution conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

*Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928).

The right to privacy may well be regarded as of great value, a protection of the innocent and of the family unit though a shelter to the guilty, and a safeguard against prosecutions destructive to family relationships.

Legalities of intrafamilial communications, then, must be justified in terms of the penumbral right of privacy, which attained the status of a constitutional guarantee in *Griswold*. Accordingly, such a right should be accorded liberal construction in favor of the privacy it was intended to secure. The Supreme Court determined in *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), that there is a "private realm of family life which the state cannot enter." Justice Harlan concluded in his dissent in *Poe v. Ullman* that "the constitution protects the privacy of the home against all unreason-able intrusion," not only against the physical intrusion prohibited by the Fourth Amendment, but also against that intrusion which would interfere with the integrity of family life, "something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted constitutional right." 367 U.S. 497, 551–52, 81 S.Ct. 1752, 1781–82, 6 L.Ed.2d 989 (1961). "Privacy" is clearly not an absolute, but nevertheless is a vital concept that on occasion gains content from the emanations of other specific guarantees, or from experience with the requirements of a free and progressive society. This concept is not fixed or static, but evolutionary, and absorptive of the powerful social standards of our dynamic society. "A principle, to be vital, must be capable of wider application than the mischief which gave it birth." *Weems v. United States*, 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed. 793 (1910). To apply the right narrowly or begrudgingly—to treat it as a historical aberration, at most to be merely tolerated—is to ignore its development and purpose. Time has not shown that protection from the evils against which this right was directed is needless or unwarranted.

Because of the constitutional stature of the right of privacy, a privilege foreclosing the compelled or voluntary disclosure of confidential information by one family member against another may be viable even in the absence of prior judicial or legislative recognition of such privilege. Where, in the most serious cases, *fundamental* rights are involved, deprivation of which is truly shocking to the conscience as well as the mind, the courts may rightly intervene to protect them by invoking the Constitution itself rather than their discretionary powers.

Creation of such a testimonial privilege represents a determination—either judicial or legislative—that fostering certain relationships outweighs the potential benefit to the judicial system of compelled disclosure. The privileged relationship is generally one that requires confidentiality and trust to function optimally. By protecting commu-

nications made in confidence, a privilege both preserves the right of privacy of the relationship and encourages open communication between others involved in the same type of association. Testimonial privileges for communications between attorney and client, husband and wife, priest and penitent, and physician and patient have become recognized, but not completely accepted, parts of American law. The family relationship cannot be judicially safeguarded in the absence of an expectation of protected privacy in intrafamilial communications, where such expectation is generally established throughout the society that values the historic importance of the family unit and its component relationships. Confidential communications between nonspousal family members have not yet, however, been afforded the status of a testimonial privilege. *Ex parte Port*, 674 S.W.2d 772 (Tex.Crim.1984); *but see, People v. Fitzgerald*, 101 Misc.2d 712, 716, 422 N.Y. S.2d 309, 313 (1979); *In re A and M*, 61 A.D.2d 426, 435, 403 N.Y.S.2d 375, 381 (1978).

In contrast, confidential communications between spouses, during their marriage and afterwards, have generally been deemed privileged. In Texas, neither spouse may testify over the objection of the other as to confidential communications between them. *Bell v. State*, 88 Tex.Cr.R. 64, 224 S.W. 1108 (1920). Either may refuse to testify about confidential communications made to the other. *Johnson v. State*, 95 Tex.Cr.R. 483, 255 S.W. 416 (1923). But the privilege may be waived. A party who acquiesces in the admission of testimony concerning these communications waives his privilege to exclude them, *Johnson*, 255 S.W. at 417, and the privilege does not apply to information acquired independently, rather than from the spouse or as a result of the marital relation. *Gibson v. State*, 516 S.W.2d 406 (Tex.Crim. App.1974); *Stallings v. State*, 476 S.W.2d 679 (Tex.Crim.App.1972). And it is well established—and specified in Texas Rules of Evidence 504(d)(1)—that there is no privilege if the communication was made, even partially, to aid anyone to commit, or plan to commit, a crime or fraud. In no case of a criminal prosecution may a spouse testify against the other (this is a disqualification, not merely a privilege, codified in Tex.Code Crim.P.Ann. art. 38.11 [Vernon 1979]), except for an offense committed by one spouse against the other, or against their child, or in certain cases of bigamy, incest, interference with child custody, or nonsupport. Either may be witness *for* the other in a criminal prosecution. *See Niles v. State*, 104 Tex.Cr.R. 447, 284 S.W. 568 (1926); *see also Bell v. State, supra.* Reason would suggest that similar qualifications and exclusions (particularly relating to child abuse or child assault) should doubtless apply to the parent-child privilege, because the family privacy interest intended to be protected is the same in both situations.

Because the marital privilege prevents access to relevant and frequently probative evidence, the exercise of that privilege is carefully restricted and subjected to close scrutiny. No privilege attaches, for example, where it is found that there was a lack of confidentiality at the time disclosure was made, and the privilege does not, by its very terms, encompass statements by a third party in the presence of a married couple. However much circumscribed, the marital privilege is indelibly established in our national jurisprudence because it is necessary to the cohesiveness and harmony of the family. At stake is nothing less than the right of a family to maintain its integrity and inviolability. The importance of the familial relationship—both to the individuals involved and to the society— stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot(ing) a way of life' through the instruction of children. *See Wisconsin v. Yoder*, 406 U.S. 205, 231–33, 92 S.Ct. 1526, 1541– 42, 32 L.Ed.2d 15 (1972).

This is not to say that the State may never intrude its authority to regulate matters touching upon familial relationships, but only that certain family privacy interests require *particularly* careful scrutiny

of the State needs asserted to justify their abridgement. The Constitution "protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Moore*, 431 U.S. at 503–04, 97 S.Ct. at 1937–38; *see also Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978).

Having sought to establish that the integrity of family relational interests is clearly entitled to constitutional protection, I turn now to an examination of the nature of the interest asserted in the case before us.

The role of the parents in developing a child's emotional stability, character, and self-image is universally recognized in our society. Erosion of this influence would have a profound effect on the individual child and on our society as a whole. It is essential to the parent-child relationship that the lines of communication between them remain open and, especially, that the child be encouraged to "talk out" his or her problems.

Certain similarities emerge upon examination of the parent-child relationship and the husband-wife relationship. Ideally, the parent-child relationship encompasses many aspects of the marital relationship— mutual love, affection, trust, and intimacy—with the parent providing the emotional guidance and the child relying upon the parent for help and support. Because parental influence is probably the most important factor in a child's development, society has a vital interest in fostering this affectionate and therapeutic relationship between parent and child. As in the marital relationship, optimal parent-child relations cannot exist without a great deal of communication between the two, characterized by a free flow of highly personal information from child to parent. This relationship, unlike the spousal, lasts during the entire lifetime of the parties, and is ongoing from generation to generation, linking the individual to both the past and the future.

Given that the fostering of a confidential parent-child relationship is necessary to the child's development of a positive system of values, and results in an ultimate good to society as a whole, what effect on that relationship would occur if the State could induce or allow children—as in the instant case—or compel their parents to disclose information given to them in a confidential setting? The security and peace of a family are as much jeopardized by the damaging testimony of an 11 year old daughter of a defendant as by that of the spouse. The recent spectacle in the aforementioned *Port* case of the State attempting to force a mother and father to reveal their child's misdeeds, in order to provide evidence for a capital murder prosecution, is shocking to my sense of decency, propriety, and fairness. If the parents refuse to divulge their children's confidences (or vice versa), the alternatives faced by the parents, i.e., the risk of prosecution for contempt or for perjury, could seriously undermine public respect and confidence in our system of justice. Should such a practice be allowed and then encouraged or abused by the State, a monumental violation of individual rights, as well as a destructive impact on the family unit in society, could result. It is inconsistent with the way of life we cherish, and raises the specter of a totalitarian regime, as created by Adolf Hitler and imagined by George Orwell, where systematic government programs attempt to "persuade" young children to inform against their parents. We want no "Hitler Jugend" in the United States, nor do we want the police to behave in a manner which brings the law into disrepute. In either case, the resulting institutional damage to the State may be as socially undesirable as the crime the police combat. The courts should not be placed in a position to say to parents, "Listen to your child at the risk of being compelled to testify about his confidences," nor should the courts require a child to choose between loyalty to his parents and loyalty to the State. This would necessarily require the State to ac-

tively punish selflessness and loyalty which are inculcated into children by their families, their churches, and even the State itself, and not only where such values are deemed consistent with the State's purposes. Such considerations would suggest that the parent-child privilege is logically based not only on the confidential nature of specific communications between parent and child, but also upon the *privacy* which is a constitutionally protectable interest of the family in American society. *See In re Agosto,* 553 F.Supp. 1298 (D.Nev.1983).[3]

I conclude, then, that while the State has an important and legitimate goal in ascertaining "the truth"[4] and presenting all relevant evidence before the court in each proceeding, this goal does not supercede the judiciary's primary commitment to justice. Pursuing this commitment, it is our paramount task to accommodate the vital social need for security and stability against the essential rights of the individual. Thus, I do not believe that the State's interest in full disclosure outweighs an individual's right of privacy in communications within the family, nor the family's interest in its integrity and inviolability. This integrity and inviolability spring from the rights of privacy *inherent* in the family relationship itself. No reasonable basis exists for extending a testimonial privilege for confidential communications to spouses who enjoy a dissoluble legal contract, while yet denying a parent or child the right to claim such a privilege to protect communications made within an indissoluble family unit, bonded by blood, affection, loyalty, tradition, and perhaps religious teaching.[5] If the rationale supporting the privilege of a witness/spouse to refuse to testify adversely against his or her spouse in a criminal proceeding, or supporting the right of a defendant/spouse to exclude such testimony of a present or former spouse, serves to prevent the invasion of the harmony and privacy of the marriage relationship itself,[6] then affording the same protection to the parent-child relationship is even more compelling. The "traditional relation of the family" is "a relation as old and as fundamental as our entire civilization." *Griswold,* 381 U.S. at 496, 85 S.Ct. at 1688.

American jurisprudence has traditionally judged the integrity of the judicial system's protection of individual rights and basic social values to be worth the price of a few guilty defendants slipping through the judicial system. In suggesting that the State should be required to prosecute defendants through other means than by allowing or compelling their family members to testify against them, I hope that this tradition will be continued—and perhaps even enhanced.

I respectfully dissent, and would hold that the motion to suppress should have been sustained because of the parent-child privilege based on the constitutional right

---

3. The parent-child relationship does not cease at the stroke of midnight on the last day of the child's 17th year. If the parent-child privilege flows from the constitutional right to privacy inherent in such a relationship, the State is forbidden to create an age barrier to limit that right to the minority of the child or to certain persons within an artificial age bracket. The parent-child relationship, unlike the marital, is not voluntary or subject to dissolution, but is ongoing throughout the lives of both participants.

4. It is illuminating to reflect on the recurring phenomenon that in the pursuit of "the truth" *to which all other social values were subordinated,* both secular and religious authorities have committed some of the bloodiest atrocities in human history, of which the Spanish Inquisition and the Salem witch trials are perhaps the most memorable.

5. See, for example, Talmudic commentary in Sanhedrin 27b:

   What is the implication of the text "The fathers shall not be put to death for the sins of the children?" If it implies the fathers shall be put to death for the *iniquity* of the fathers, that has already been stated (Deut. 24, 16): "every man shall be put to death for his own sin." But the text implies that the fathers shall not be put to death *on the testimony* of the children and the children *on the testimony* of their fathers.

6. In *Trammel v. United States,* 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980), the Supreme Court decided that the privilege against adverse spousal testimony remains a viable principle of federal law, and the court modified the privilege only by vesting it solely in the testifying spouse.

of privacy, the Fourth Amendment to the United States Constitution, and articles 18.-01(b)[7] and 38.23[8] of the Texas Code of Criminal Procedure.

7. Art. 18.01(b) provides in relevant part:
   No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance. A sworn affidavit setting forth substantial facts establishing probable cause shall be filed in every instance in which a search warrant is requested.

8. Art. 38.23 provides in relevant part:
   No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted as evidence against the accused on the trial of any criminal case.