**610-15**

Case No. 10-13-00160-CR  ORIGINAL

IN THE COURT OF CRIMINAL
APPEALS of Texas.

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUL 27 2015

Abel Acosta, Clerk
FILED IN
COURT OF CRIMINAL APPEALS

JUL 27 2015

Abel Acosta, Clerk

ARACELI TELLO

V.S.

State of Texas

Discretionary Review With Petition
272nd Judicial District of Brazos Co. Tx

Cause No. 12-02891-CRF-272

# Craig M. Greaves
*Attorney at Law*

118B South Main Street
Bryan, Texas 77803
craig@greaveslaw.com

Barbie Bohler - Legal Assistant
barbie@greaveslaw.com

Office: 979-779-9388
Fax: 979-779-9387
www.greaveslaw.com

Marion Blalock - Office Manager
marion@greaveslaw.com

April 28, 2015

*(Legal Correspondence)*

Araceli Tello
TDCJ # 01855166
Texas Department of Corrections
Hobby Unit
742 FM 712
Marlin, TX 76661

RE:     Opinion and Judgement

Araceli,

I have enclosed a copy of the opinion and judgment issued by the 10th Court of Appeals in regards to the appeal of your Aggravated Robbery conviction. Unfortunately, the Tenth Court of Appeals did not reverse your conviction.

You have the right to file a pro se Petition for Discretionary Review asking the Texas Court of Criminal Appeals to review the decision reached by the 10th Court of Appeals. If this is something that you are interested in doing your Petition for Discretionary Review must be filed with the Texas Court of Criminal Appeals within thirty (30) days from the date that the 10th Court of Appeals issued its ruling in your case. In other words, **your Petition for Discretionary Review must be filed with the Texas Court of Criminal Appeals no later than May 22, 2015**. Based on the fact that the 10th Court of Appeals' decision to affirm your conviction was not unanimous (one of the appellate judges felt that the trial court did error in the way it handled your case), I would recommend that you file a pro se Petition for Discretionary Review. To assist you in doing so, I have enclosed a copy of Rule 68 of the Texas Rules of Appellate Procedure which outlines the steps to filing a Petition for Discretionary Review.

Sincerely,

Craig M. Greaves



Enc:     Opinion and Judgement of the 10th Court of Appeals (21 Pages)
Rule 68, Texas Rules of Appellate Procedure (3 Pages)



FOR P.D.R.
Packet

✗ **CASE NO. 10-13-00160-CR**

IN THE COURT OF APPEALS
FOR THE TENTH DISTRICT
AT WACO, TEXAS

---

## ARACELI TELLO

### VS.

## STATE OF TEXAS

---

Appeal from the
272nd Judicial District of Brazos County, Texas

Cause No. 12-02891-CRF-272

---

### BRIEF OF APPELLANT

---

**Attorney for Appellant:**

Craig M. Greaves
Law Office of Craig M. Greaves
118 B South Main Street
Bryan, Texas 77803
979/779-9388 Telephone
979/779-9387 Facsimile

**Attorney for Appellee:**

Jarvis J. Parsons
Brazos County District Attorney
300 East 26th Street, Ste. 310
Bryan, Texas 77803
979/361-4320 Telephone
979/361-4368 Facsimile

## ORAL ARGUMENTS REQUESTED

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument as the factual issues as related in Point of Error Number One and Point of Error Number Two have not previously been litigated in an Appellate Court in Texas.

## IDENTITY OF PARTIES

Appellant:

Araceli Tello
TDCJ #: 01855166
William P. Hobby Unit
742 FM 712
Marlin, Texas 76661

Appellant's Appellate Counsel:

Craig M. Greaves
State Bar #: 24025392
118 B South Main Street
Bryan, Texas 77803
979/779-9388 Telephone
979/779-9387 Facsimile

Appellant's Trial Counsel:

Craig M. Greaves
State Bar #: 24025392
118 B South Main Street
Bryan, Texas 77803
979/779-9388 Telephone
979/779-9387 Facsimile

Appellee's Trial Counsel:

Misty D. Swan,
Assistant Brazos County District Attorney
State Bar #: 24056399

Ryan C. Calvert,
Assistant Brazos County District Attorney
State Bar #: 24036308

Office of the Brazos County District Attorney
300 East 26th Street, Ste. 310
Bryan, Texas 77803
979/361-4320 Telephone
979/361-4368 Facsimile

Appellee's Appellate Counsel:

Jarvis J. Parsons,
Brazos County District Attorney
State Bar #: 24032934
Office of the Brazos County District Attorney
300 East 26th Street, Ste. 310
Bryan, Texas 77803
979/361-4320 Telephone
979/361-4368 Facsimile

Trial Court:                          Hon. Travis B. Bryan, III
                                      272nd Judicial District of Brazos County
                                      300 East 26th Street, Ste. 204
                                      Bryan, Texas 77803
                                      979/361-4220 Telephone
                                      979/361-4517 Facsimile

# TABLE OF CONTENTS

Statement Regarding Oral Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Identity of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

List of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Statement of the Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Issues Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Summary of Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-11

**Point of Error Number One:**

THE TRIAL COURT ERRED IN RULING THAT APPELLANT COULD NOT QUESTION THE VICTIM'S SPOUSE AS TO WHAT COMMUNICATIONS THAT THE VICTIM HAD PREVIOUSLY WITH HIS WIFE REGARDING THE FACTS SURROUNDING THE ALLEGED AGGRAVATED ROBBERY. . . . . . . . . . . . . . . . 8

**Point of Error Number Two:**

THE TRIAL COURT VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT BY DENYING THE APPELLANT THE ABILITY TO OBTAIN ANY IDENTIFYING INFORMATION OF A MATERIAL WITNESS IN ORDER TO COMPEL THIS WITNESS' ATTENDANCE TO TESTIFY AT TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . 10

Conclusion and Relief Requested. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

# LIST OF AUTHORITIES

**Cases–**

**Coleman v. State**,
996 SW2d 525 (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Diehl v. State**,
698 SW2d 712 (Tex. App. Houston– 1ˢᵗ Dist. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Irvan v. State**,
2006 WL 1545484 (Tex. Crim. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**United States v. Valenzuela-Bernal**,
458 US 858 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Weaver v. State**,
855 SW2d 116 (Tex. App. Houston– 14ᵗʰ Dist. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Statues/Rules–**

**TEX.R.CRIM.EVID.** 504 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATEMENT OF THE CASE

On or about May 4, 2012, Appellant allegedly committed the offense of Aggravated Robbery. **CR Vol 1 Pg 1**. On or about May 17, 2012, Appellant was arrested for said offense. **CR Vol 1 Pg 2**. On or about April 2, 2013, a jury trial commenced in Appellant's case. **RR Vol 2 Pg 1**. On or about April 4, 2013, Appellant was found guilty of the offense of Aggravated Robbery. **RR Vol 4 Pg 78 (18-24)**. On or about April 4, 2013, Appellant was sentenced to a term of thirty-five years confinement in the Texas Department of Criminal Justice– Institutional Division by the Trial Court. **RR Vol 5 Pg 39 (18-21)**. On or about May 3, 2013, a Notice of Appeal was filed. **CR Vol 1 Pg 77-78**.

## ISSUES PRESENTED

### Point of Error Number One

THE TRIAL COURT ERRED IN RULING THAT APPELLANT COULD NOT QUESTION THE VICTIM'S SPOUSE AS TO WHAT COMMUNICATIONS THAT THE VICTIM HAD PREVIOUSLY WITH HIS WIFE REGARDING THE FACTS SURROUNDING THE ALLEGED AGGRAVATED ROBBERY.

### Point of Error Number Two

THE TRIAL COURT VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT BY DENYING THE APPELLANT THE ABILITY TO OBTAIN ANY IDENTIFYING INFORMATION OF A MATERIAL WITNESS IN ORDER TO COMPEL THIS WITNESS' ATTENDANCE TO TESTIFY AT TRIAL.

## STATEMENT OF FACTS

The Statement of Facts is deferred and included in the Point of Errors urged.

## SUMMARY OF ARGUMENT

In Appellant's first Point of Error she complains in this Court that the Trial Court erred in finding that communications made by one spouse to another were still protected by the "Confidential Communication Privilege" in spite of the fact that one spouse had previously disclosed the contents of these communications while testifying on behalf of the State.

In Appellant's second Point of Error she complains in this Court that the Trial Court violated her Sixth Amendment right by preventing Appellant from being able to obtain any identifying information necessary in order to compel a witness to testify at trial. The testimony of this witness was material to Appellant's defense in that it would have seriously eroded the credibility of the State's main witness against Appellant.

CASE NO. 10-13-00160-CR


IN THE COURT OF APPEALS
FOR THE TENTH DISTRICT
AT WACO, TEXAS

---

ARACELI TELLO


VS.


STATE OF TEXAS

---

Appeal from the

272nd Judicial District of Brazos County, Texas


Cause No. 12-02891-CRF-272

---

BRIEF OF APPELLANT

---

Appellant in the above referenced cause number, files this Brief setting forth her point of

error committed in the Trial Court and would show the Court the following:

During the State's direct examination, Leobardo Flores (Flores) testified that at the time he

was allegedly robbed at gunpoint that he and his wife were having martial problems. **RR Vol 3 Pg**

**139 (9).** He stated that these problems stemmed from his wife's infidelity. **RR Vol 3 Pg 139 (9-**

10). In response to his wife's unfaithfulness, Flores decided that he would cheat on her. **RR Vol 3 Pg 139 (10-12)**. To accomplish his goal, Flores sought the services of a prostitute and was eventually introduced to Appellant. **RR Vol 3 Pg 142 (4-12)**. Flores and Appellant attempted to have sex during their initial encounter, but Flores was unable to perform. **RR Vol 3 Pg 143 (9-12)**.

Approximately two weeks after Flores' failed attempt to cheat, Appellant allegedly contacted him to inform him that she wanted to introduce him to another prostitute that might better serve his needs. **RR Vol 3 Pg 144**. Flores was open to this idea and eventually met up with Appellant and this other prostitute. **RR Vol 3 Pg 144 (11-13)**. There was not enough time for Flores and this prostitute to have sexual intercourse during this meeting, but Flores paid this prostitute $100.00 in the belief that he would see her again in the near future. **RR Vol 3 Pg 144 (18-25) & Pg 145 (1-12)**.

Approximately a week later, Appellant allegedly contacted Flores to arrange a second meeting between him and this other prostitute. **RR Vol 3 Pg 146 (9-20)**. Flores agreed to do so and plans were made for all three to meet at a local convenience store. **RR Vol 3 Pg 146 (23-25) & Pg 147 (1)**. But when Flores arrived at this store, only Appellant was present. **RR Vol 3 Pg 147 (2-4)** When Flores asked where the other prostitute was, Appellant allegedly replied that the other prostitute had left to drop off her child and that they would meet her at another location shortly. **RR Vol 3 Pg 147 (5-7)** Appellant then got into Flores' vehicle and directed him to the location that they were to meet the other prostitute. **RR Vol 3 Pg 147 (8-9)** Upon arriving at this location, Appellant and a male accomplice allegedly robbed Flores, taking Flores' wallet containing $1000.00 and his cell phone. **RR Vol 3 Pg 155 (16-25) & Pg 156 (1-23)**

During cross examination, Flores was asked for the name of his wife. **RR Vol 3 Pg 163 (15)**. The State objected on the grounds of relevance; however, said objection was overruled by the Trial Court. **RR Vol 3 Pg 163 (16-18)**. In response, the State then asked to approach the bench where the following exchange occurred:

Ms. Swan: Judge, I think the concern is that Mr. Flores is concerned about retaliation because his wife works at a gas station; and he is informed that the co-defendant, Robert Sierra, might actually come to that gas station. So, I think he is uncomfortable giving the name of one of his loved ones in fear of retaliation. **RR Vol 3 Pg 164 (8-13)**

Mr. Greaves: Judge, I don't know anything about Robert Sierra going to a gas station, Number 1. I don't know if he stopped there to get gas. But she could be a very key witness as to what he might have told her about this situation. So, for that reason— I mean, I don't know who she is. I might need to subpoena her. **RR Vol 3 Pg 164 (14-19)**

The Court: You want to subpoena her up here? **RR Vol 3 Pg 164 (20-21)**

Mr. Greaves: Well, I'll have to see how his testimony goes. **RR Vol 3 Pg 164 (22-23)**

The Court: What has been said about her to this point? **RR Vol 3 Pg 164 (24-25)**

Mr. Greaves: Well, she's been brought up that he's married. **RR Vol 3 Pg 165 (3-4)**

The Court: And I think somebody said that he almost broke up with her– **RR Vol 3 Pg 165 (5-6)**

Mr. Greaves: That she was cheating. **RR Vol 3 Pg 165 (7)**

The Court: She was cheating; so, he decided to cheat on her; and now, he's gone back with her. **RR Vol 3 Pg 165 (8-9)**

-3-

**The Court:** So, do you think that he might have talked to her? **RR Vol 3 Pg 165 (14-15)**

**Mr. Greaves:** Well, Judge, that seems logical that they would discuss this. And this deal about her cheating on him is the reason for their broken up, that's the first time I've ever heard that. **RR Vol 3 Pg 165 (16-19)**

**The Court:** I'm just trying to think through it all. So, if he gives you the name, you're going to subpoena her up here, right? **RR Vol 3 Pg 165 (20-22)**

**Mr. Greaves:** I'm going to have to ask the address after that, but I can do that off the record, I guess. I mean, there's a good possibility. **RR Vol 3 Pg 165 (23-25)**

**Mr. Calvert:** But, I mean, we're talking about a witness that has absolutely no personal knowledge about the facts of what happened. The only potential knowledge she could have is, you know, if he relayed to her what happened. But he's talked to — now, we've already got in what he told the 9-1-1 operator, what he told the detective. We're going to play the recording of what he told the detective. He talked to two more detectives at a later date; and now, he's testified here in court; and, you know, we're going to go fishing for --he's always told the same story but maybe he told his wife something different on — .... **RR Vol 3 Pg 167 (7-18)**

**Mr. Calvert:** I guess, the basis of our objection, Judge, the test under 401 is does the evidence -- does the question that's on the table have a tendency to make the existence of a fact of consequence in the case more or less likely. And applying that standard, which is the 401 standard, to what's your wife's name, I don't see where that makes any fact of consequence in this aggravated robbery prosecution of this Defendant more or less likely. **RR Vol 3 Pg 168 (15-23)**

**The Court:** What can you articulate for the record as to why you need this name? **RR Vol 3 Pg 170 (14-15)**

**Mr. Greaves:** Well, Judge, I mean, it has been mentioned by the State and brought forth the fact that he has -- in the initial tapes of

-4-

Fleming and during their conversation, Fleming testified, about his being married and in the process of divorce, not wanting her to find out about this -- I'm trying to recall everything he said to Fleming. At that point, there was also testimony brought through Mr. Flores by Ms. Swan as to she had cheated on him. He had cheated on her now, doing this cheat on her, that they're back together and these kind of things. And, Judge, the part about her cheating on him, I had never heard that. It's not in any other statements, anything like that. I want to potentially talk to her at least -- be able to talk to her and – **RR Vol 3 Pg 170 (16-25) & Pg 171 (1-6)**

The Court:

Do you have any other way of finding her and talking to her? **RR Vol 3 Pg 171 (7-8)**

Mr. Greaves:

No, sir. I mean, I don't know her name. I think everything I received from the State did not have an address for him. **RR Vol 3 Pg 171 (9-11)**

The Court:

So, you don't know where she's living? **RR Vol 3 Pg 171 (12-13)**

Mr. Greaves:

No, sir, never have. If they want to bring her up here, I don't have to serve her or whatever; and I can sit down and talk to her. That's fine. **RR Vol 3 Pg 171 (14-17)**

Mr. Calvert:

We're talking about a completely collateral issue that has nothing to do with this case,.... The only other way that -- kind of getting to what he was taking about earlier, that the wife could even potentially play a role in this, is if there were any kind of prior inconsistent statements. But in order to get in anything that he told her about this offense as a prior inconsistent statement, two things have to happen. He first has to give the witness an opportunity to explain or deny making that statement before we can bring in the wife and have extrinsic evidence of it. No such impeachment has happened, nor will there be any because there's no evidence whatsoever that any such prior inconsistent statement was made.... And so, absent any evidence that he ever made any prior inconsistent statements and absent any questions to the witness offering him an opportunity to explain or deny any prior inconsistent statements, it didn't come in there either. And so, now, we're back to the relevance issue; and that's the basis of our objection. **RR Vol 3 Pg 171 (20-25) & Pg 172 (1-25) & Pg 173 (1-9)**

-5-

| | |
|---|---|
| Mr. Greaves: | Judge, look, I don't want to tell my defense; but, I guess, I'm forced to. I'm going to have to do that. I mean, my defense basically here is a guy, according to everything I had up to this point, was that is he is...My deal basically is there's some talk about this cash, large amount of cash. He's got that. He loses his cash somehow that night, be it paying prostitutes or somebody steals it, don't know. But then, you know, it's something to it. Like I was getting at before, if you sit there and say, "Look, I couldn't perform or whatever. I lost my money," the cop's not going to get it back for you. If you say, "Somebody stole it from me," he's going to get it back for you. And explaining to the wife as to why I don't have this money, and that's -- I want to see what this discussion goes on with her. **RR Vol 3 Pg 173 (10-25) & Pg 174 (3-14)** |
| The Court: | So, what is your response to that argument, impeachment on a collateral matter? **RR Vol 3 Pg 175 (5-6)** |
| Mr. Greaves: | I mean, as to that, that's not my main concern or what I tried to do. I want to get to what -- how did he explain this to his wife. Because there is -- I mean, defensive theory that he called the cops and yelled robbery because he wanted his money back. **RR Vol 3 Pg 175 (7-11)** |
| The Court: | Has anyone on the behalf of the State, to your knowledge, received any inkling of information about what this wife might say that could be considered exculpatory by any argument? **RR Vol 3 Pg 178 (8-11)** |
| Mr. Calvert: | No, sir. We have never spoken to her. I don't believe that law enforcement ever spoke to her. Our investigator has not spoken to her. Our victim coordinator has not spoken to her. She -- from the State's perspective, law enforcement perspective, the wife has absolutely no role in this investigation or in this case whatsoever. **RR Vol 3 Pg 178 (12-18)** |

After further debate, the Trial Court eventually ruled:

"I'm going to interview the witness in-camera, and I'm going to take a list of questions from you. And it will be on the record, sealed in the record; and I'm going to find out what you want to know without you knowing who she is or her address or phone number. If she has exculpatory information, I'm going to grant your request to talk to her."

**RR Vol 3 Pg 180 (19-25).**

The Appellant was then allowed to continue with her cross-examination of Flores. **RR Vol 3 Pg 183 (10).** During said cross-examination, Flores admitted that the $1,000.00 allegedly stolen from him was money which would have been used to support his household. **RR Vol 3 Pg 221.** He further admitted that if, for any reason, he was not able to provide his paycheck to support his household that it would have caused further problems in his already strained marriage. **RR Vol 3 Pg 222 (3-6).** But when asked about what he told his wife as to the whereabouts of the missing $1,000.00, Flores initially testified that he has never told his wife about the allegedly robbery. **RR Vol 3 Pg 222 (14-22).** However, Flores's later testified that his wife learned of the facts surrounding the alleged robbery from a newspaper article that had been posted on Facebook. **RR Vol 3 Pg 233 (1-5).** Upon being confronted by his wife about the facts contained in the newspaper article, Flores claimed that the article was a lie and that he was never in a vehicle with Appellant. **RR Vol 3 Pg 234 (13-22).**

At the conclusion of Flores' testimony, the State re-urged its argument against the Trial Court's previous decision to conduct an in-camera interview of Flores' wife. **RR Vol 3 Pg 236 (20-25) & Pg 237 (1-3).** The Trial Court informed the parties that it still planned on proceeding with the in-camera interview of Flores' wife and then recessed court for the day. **RR Vol 3 Pg 238 (8-11).**

The following morning, the State urged a new objection to the Trial Court conducting an in-camera interview of Flores' wife. **RR Vol 4 Pg 7 (19-25).** The State claimed that any discussions Flores had with his wife regarding the facts surrounding the alleged robbery were marital communications and were therefore privileged from disclosure. **RR Vol 4 Pg 8 (2-25) &**

-7-

**Pg 9 (1-7).** The Trial Court sustained the State's objection, but allowed Appellant to read into the record the contents of a newspaper article which Appellant believed was the same article that the wife had previously confronted Flores with. **RR Vol 4 Pg 33 (8-9) & Pg 38 (1-25) & Pg 39 (1-14).** Appellant also submitted for purposes of the record a copy of the questions that the Trial Court had previously asked her to prepare in anticipation of the in-camera interview of Flores' wife. <u>See</u> Court's Ex 1.

<u>**POINT OF ERROR NUMBER ONE**</u>

**THE TRIAL COURT ERRED IN RULING THAT APPELLANT COULD NOT QUESTION THE VICTIM'S SPOUSE AS TO WHAT COMMUNICATIONS THE VICTIM HAD PREVIOUSLY HAD WITH HIS WIFE REGARDING THE FACTS SURROUNDING THE ALLEGED AGGRAVATED ROBBERY.**

The "Confidential Communication Privilege" as set out in **TEX.R.CRIM.EVID.** 504(a) is not absolute. In <u>**Weaver**</u>, the 14th Court of Appeals held that any confidential communication privilege that might exist at the time the declaring spouse initially communicates with his/her spouse is waived when the declaring spouse, "informed third parties of the contents of those communications." <u>See</u> <u>**Weaver v. State**</u>, 855 SW2d 116, 121 (Tex. App. Houston– 14th Dist. 1993); <u>see</u> <u>**also**</u> <u>**Diehl v. State**</u>, 698 SW 2d 712, 719 (Tex. App. Houston– 1st Dist. 1985) ("A party who acquiesces in the admission of testimony concerning these communications waives his privilege to exclude them.)

During cross examination by Appellant, Flores was questioned about what communications he had with his wife about the facts surrounding the alleged robbery. At no time during this questioning did the State object that contents of these communications were privileged. Furthermore, Appellant sought and was granted the expressed approval of the Trial

-8-

Court prior to question Flores regarding these communications. **RR Vol 3 Pg 181 (18-20)**. It was not until after Flores had finished testifying, that the State finally claimed that any further attempt at questioning Flores or his wife about their discussions would be improper under the theory that these communications were in some way protected. **RR Vol 4 Pg 8 (2-4)**. In doing so, the State brought to the Trial Court's attention,

> "And I didn't have a whole lot of time to do a whole bunch of research on this specific issue, but there is a case -- it's *Irvan*, I-R-V-A-N, *v. State*. It's out of -- what is this out of? Oh, this is Court of Criminal Appeals from 2006. And this was a murder case where the spouse was actually the defendant. But this case outlines and delineates the fact that 504 does create two separate privileges, the communication privilege and the testimony privilege. And one of the things that was asked of the spouse in this case over the -- actually, the proper action in this case, was what the -- what the husband had told his wife about his whereabouts and what he was doing at the time of the offense -- in this case, it was a murder. And the Court of Criminal Appeals in that case said that absolutely that was covered under 504(a), under marital communication. That was error to admit that testimony. And that's *Irvan v. State*."

However, the State failed to mention to the Trial Court that **Irvan** is an unpublished opinion. See **Irvan v. State**, 2006 WL 1545484 (Tex. Crim. App. 2006). Additionally, **Irvan** in no way addresses the issue of waiving the confidential communications privilege.

It is apparent that when Flores volunteered the contents of the communications that he had with his spouse about the alleged robbery he waived any possible privilege that he held in regards to these communications. Furthermore, if the State held any ability to preserve this privilege on behalf of Flores it failed to timely object to the disclosure of these communications. Therefore, the Trial Court erred in not allowing Flores' wife to answer the questions that had been prepared by Appellant.

## POINT OF ERROR NUMBER TWO

## THE TRIAL COURT VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT BY DENYING THE APPELLANT THE ABILITY TO OBTAIN ANY IDENTIFYING INFORMATION OF A MATERIAL WITNESS IN ORDER TO COMPEL THIS WITNESS' ATTENDANCE TO TESTIFY AT TRIAL.

The Sixth Amendment right to compulsory process, "is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." **Coleman v. State**, 996 SW2d 525, 527 (Tex. Crim. App. 1998). To be able to exercise one's right to compulsory process, "the defendant must make a plausible showing to the trial court, "that the witness' testimony would be both material and favorable to the defense." **Coleman**, 996 SW 2d at 527. In a situation where a defendant has not had a previous opportunity to interview a witness, "it is of course not possible to make any avowal of how a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence of absence of the required materiality." **United States v. Valenzuela-Bernal**, 458 US 858, 871 (1998).

Prior to trial, Appellant had access to no identifying information as it related to Flores' wife. Without such information, there was not any way to interview this woman before the commencement of Appellant's jury trial. At trial, Appellant attempted to illicit from Flores the name and physical location of his wife. This information was sought by Appellant where a subpoena could be issued to compel the wife's attendance to testify before the jury about Flores' previous statements to her that he was never in the company of Appellant at the time of the alleged robbery. Despite the apparent favorable and material nature of the wife's predicted

-10-

testimony, the Trial Court denied Appellant's ability to obtain any of the necessary information to compel this woman's presence at trial.

## CONCLUSION AND RELIEF REQUESTED

Appellant requests this Court to reverse the jury verdict in present case and remand for a new trial.

Respectfully Submitted,

*Craig M. Greaves*
Craig M. Greaves
118 B South Main Street
Bryan, Texas 77803
979/779-9388 Telephone
979/779-9380 Facsimile
craig@greaveslaw.com
SBN: 24025392

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon the counsel of record listed below via e-mail on this the 19th day of September, 2014.

Doug Howell,
Assistant Brazos County District Attorney
**Dhowell@brazoscountytx.gov**

Jessica Escue
Assistant Brazos County District Attorney
**JEscue@brazoscountytx.gov**

*Craig M. Greaves*
Craig M. Greaves

-11-



No. 10-13-00160-CR

ARACELI TELLO,

Appellant

v.

THE STATE OF TEXAS,

Appellee

From the 272nd District Court
Brazos County, Texas
Trial Court No. 12-02891-CRF-272

## MEMORANDUM OPINION

A jury found Appellant Araceli Tello guilty of aggravated robbery, and the trial court assessed her punishment, enhanced by prior felony convictions, at thirty-five years' imprisonment. This appeal ensued.

The relevant facts are as follows: Leobardo Flores, the alleged victim, testified that he and his wife were together as a couple at the time of trial but that in May 2012, he "thought to cheat on her" because she had cheated on him. On May 4, he received several phone calls from Tello, whom he had known for about fifteen or twenty days as

a prostitute named Juanita. He agreed to meet up with Tello so that he could get together with Tello's friend. When he arrived at the store where they were supposed to meet, Tello came to his car and got inside. He asked where her friend was, and Tello told him that she had gone to take her child to the babysitter but that she would come and get together with them. He then asked Tello where to go, and she directed him to a place by the railroad tracks to wait.

Flores stated that he had a feeling that something was wrong. A car approached and parked behind them. He told Tello that it was not her friend, but Tello assured him that it was. He started the car and tried to pull away, but Tello told him to wait. A man then approached Tello's window, which was open, and pointed a gun at Flores. The man told him to give him his wallet and phone, which he did. He had gotten paid that day and had about $1,000 in his wallet. The man told him not to call the police or he would kill him. Tello left with the man. Flores then went back to the store where he had met Tello and called the police.

During cross-examination, Tello's counsel asked Flores what the name of his wife is. The State made a relevance objection that the trial court overruled. The following exchange then occurred outside the presence of the jury:

> [Prosecutor]: ... So, I think he is uncomfortable giving the name of one of his loved ones in fear of retaliation.
>
> [Defense Counsel]: ... But she could be a very key witness as to what he might have told her about this situation. So for that reason -- I mean, I don't know who she is. I might need to subpoena her.
>
> THE COURT: You want to subpoena her up here?

Tello v. State

[Defense Counsel]: Well, I'll have to see how his testimony goes.

THE COURT: What has been said about her to this point?

[Defense Counsel]: Nothing.

THE COURT: Yeah, she's been brought up.

[Defense Counsel]: Well, she's been brought up that he's married.

THE COURT: And I think somebody said that he almost broke up with her --

[Defense Counsel]: That she was cheating.

THE COURT: She was cheating; so, he decided to cheat on her; and now, he's gone back with her.

[Prosecutor]: And I don't care if he wants to get into the relationship or what -- anything like that. It's just I think he's concerned about giving up a family member's name.

THE COURT: So, do you think he might have talked to her?

[Defense Counsel]: Well, Judge, that seems logical that they would discuss this. And this deal about her cheating on him is the reason for their broken up, that's the first time I've ever heard that.

THE COURT: I'm just trying to think through it all. So, if he gives you the name, you're going to subpoena her up here, right?

[Defense Counsel]: I'm going to have to ask the address after that, but I can do that off the record, I guess. I mean, there's a good possibility.

. . . .

[Defense Counsel]: I understand all that. But, I mean, getting ahold of a witness. That deal when he said something about, "Well, she had cheated on me," I had never heard that before. Never heard that.

Tello v. State

[Prosecutor]: Well, the thing about cheating went to his motive to engage in prostitution. It has nothing to do with the robbery, other than that's how he came to be there that night.

[Defense Counsel]: It potentially could.

[Prosecutor]: But, I mean, we're talking about a witness that has absolutely no personal knowledge about the facts of what happened. The only potential knowledge she could have is, you know, if he relayed to her what happened. But he's talked to -- now, we've already got in what he told the 9-1-1 operator, what he told the detective. We're going to play the recording of what he told the detective. He talked to two more detectives at a later date; and now, he's testified here in court; and, you know, we're going to go fishing for -- he's always told the same story but maybe he told his wife something different on ....

....

[Prosecutor]: I guess, the basis of our objection, Judge, the test under 401 is does the evidence -- does the question that's on the table have a tendency to make the existence of a fact of consequence in the case more or less likely. And applying that standard, which is the 401 standard, to what's your wife's name, I don't see where that makes any fact of consequence in this aggravated robbery prosecution of this Defendant more or less likely.

....

THE COURT: What can you articulate for the record as to why you need this name?

[Defense Counsel]: Well, Judge, I mean, it has been mentioned by the State and brought forth the fact that he has -- in the initial tapes of [Detective] Fleming and during their conversation, Fleming testified, about his being married and in the process of divorce, not wanting her to find out about this -- I'm trying to recall everything he said to Fleming.

At that point, there was also testimony brought through Mr. Flores by [Prosecutor] as to she had cheated on him. He had cheated on her now, doing this cheat on her, that they're back together and these kind of things.

And, Judge, the part about her cheating on him, I had never heard that. It's not in any other statements, anything like that. I want to potentially talk to her at least -- be able to talk to her and --

THE COURT: Do you have any other way of finding her and talking to her?

[Defense Counsel]: No, sir. I mean, I don't know her name. I think everything I received from the State did not have an address for him.

THE COURT: So, you don't know where he's living?

[Defense Counsel]: No, sir, never have. If they want to bring her up here, I don't have to serve her or whatever; and I can sit down and talk to her. That's fine.

[Prosecutor]: May I respond to his argument?

THE COURT: Yes, sir.

[Prosecutor]: We're talking about a completely collateral issue that has nothing to do with this case, other than that was why he was looking to get with a prostitute, was because of the situation with his wife. But as far as the offense that's alleged, whether -- what he's wanting to go into is whether or not, in fact, his wife cheated on him. That is -- I mean, that's what you've said several times now. That issue is completely collateral to this case.

And so, that would be my response as to our relevance objection, is you're talking about testimony on an issue that is completely collateral to and has no bearing on the facts of this case.

The only other way that -- kind of getting to what he was taking [sic] about earlier, that the wife could even potentially play a role in this, is if there were any kind of prior inconsistent statements. But in order to get in anything that he told her about this offense as a prior inconsistent statement, two things have to happen. He first has to give the witness an opportunity to explain or deny making that statement before we can bring in the wife and have extrinsic evidence of it. No such impeachment has happened, nor will there be any because there's no evidence whatsoever that any such prior inconsistent statement was made.

And the prior inconsistent statement rules are not a license -- are not a fishing license. You cannot go, "Well, I now want -- I now, in

trial, want the information, the names and addresses of every person that you may have ever talked to ever to see if there is a prior inconsistent statement." That's not what that's for.

And so, absent any evidence that he ever made any prior inconsistent statements and absent any questions to the witness offering him an opportunity to explain or deny any prior inconsistent statements, it didn't come in there either.

And so, now, we're back to the relevance issue; and that's the basis of our objection.

....

[Defense Counsel]: Up to this point, you've listened to Fleming's tape as well as their testimony. He says that he's going through a divorce, but he's trying to fix it. And, I mean, I think --

THE COURT: He's going through a divorce and trying to fix it?

[Defense Counsel]: He's told Fleming they're trying -- he's trying to fix it, trying to get back with her when this happens.

THE COURT: Okay.

[Defense Counsel]: All right. My deal basically is there's some talk about this cash, large amount of cash. He's got that. He loses his cash somehow that night, be it paying prostitutes or somebody steals it, don't know. But then, you know, it's something to it. Like I was getting at before, if you sit there and say, "Look, I couldn't perform or whatever. I lost my money," the cop's not going to get it back for you.

If you say, "Somebody stole it from me," he's going to get it back for you. And explaining to the wife as to why I don't have this money, and that's -- I want to see what this discussion goes on with her.

....

THE COURT: So, he's trying to make himself look better by saying "she's cheating on me;" so, you could interrogate her and find out, you know, if that's true or not. Bring her up to say, "No, I wasn't cheating on him. He's lying about that." But as the Prosecutor said, that appears to be a collateral matter and you're not entitled to impeach on a collateral matter.

So, what is your response to that argument, impeachment on a collateral matter?

[Defense Counsel]: I mean, as to that, that's not my main concern or what I tried to do. I want to get to what -- how did he explain this to his wife. Because there is -- I mean, defensive theory that he called the cops and yelled robbery because he wanted his money back.

    ....

THE COURT: Has anyone on the behalf of the State, to your knowledge, received any inkling of information about what this wife might say that could be considered exculpatory by any argument?

[Prosecutor]: No, sir. We have never spoken to her. I don't believe that law enforcement ever spoke to her. Our investigator has not spoken to her. Our victim coordinator has not spoken to her. She -- from the State's perspective, law enforcement perspective, the wife has absolutely no role in this investigation or in this case whatsoever.

    ....

THE COURT: I'm going to interview the witness in-camera, and I'm going to take a list of questions from you. And it will be on the record, sealed in the record; and I'm going to find out what you want to know without you knowing who she is or her address or phone number. If she has exculpatory information, I'm going to grant your request to talk to her.

    ....

THE COURT: So, for now, I'm denying -- I'm taking your request under advisement until I interview the witness. So, right now, you can't ask what her name is.

[Defense Counsel]: Or address or --

THE COURT: Not yet.

[Defense Counsel]: But I can ask as to what he told his wife about this and all.

THE COURT: Yeah, you can ask him that.

Tello's counsel then continued his cross-examination of Flores, which included the following exchange:

Q.    [(By Defense Counsel] And you're still living with your wife at this time, correct?

A.    That is right.

Q.    Okay. Did you tell your wife you were going to do something else or going to be -- you wouldn't be home for awhile?

A.    That's right.

    ....

Q.    Okay. And you had told your wife that you had -- you were just going to leave your home and go step out some[ ]place for awhile, correct?

A.    No.

Q.    What did you -- I think you testified earlier that's what you did. You left your home?

A.    No.

Q.    Okay.

A.    No.

Q.    Okay. So, where were you coming from?

THE INTERPRETER: I'm sorry?

[Defense Counsel]: Where were you coming from?

THE WITNESS: From having my hair done -- cut.

Q.    (By [Defense Counsel]) And so, had you told your wife your whereabouts, where you were going to be at that time?

A.     Regularly, I come out from work.  I come out late from work. When I call my wife that I was going to come back late from work, but not too late.

Q.     Okay.  So, you're telling her that you're still at work?

A.     That's right.

Q.     You don't recall earlier in your testimony where you told me that you told her you just had to go run an errand basically?

A.     No.

Q.     Okay.  So, she thinks you're still at work; and you're out trying to meet this prostitute?

A.     That's right.

Q.     Okay.  And, I mean, she knows -- your wife knows you got paid that day, on Friday?

A.     That's right.

     ....

Q.     No, I guess my question is:  Did you tell your wife -- yes or no -- tell her about you getting robbed?

A.     No.

Q.     She knows nothing of this?

A.     After the time she began getting to know it.

Q.     So, how -- did you tell her about it; or did somebody else tell her about it?

A.     The letters that I received at home, they say that I was involved in a robbery; so, she started asking me questions about what happened that day.

Q.     Okay.  And you told her that someone held you up at gunpoint?

Tello v. State

A. No.

Q. Okay. You told her that you were there waiting to meet a prostitute?

A. No.

Q. Okay. But she has asked you on other occasions about what these letters are and all that, correct?

A. That's right.

....

Q. Okay. Okay. ... I'm going to ask you this question: You stated that you had not told your wife about what happened, the facts of this case, correct, the facts of this case?

A. Correct, not the details.

Q. She came to you and said, "What are these letters about you being robbed," correct?

A. That's right.

Q. What did you tell her?

A. I told her a story.

Q. Well, tell us what story you told her.

A. Yes, I tried to get away from telling her that I was going to go meet with a prostitute.

Q. What story did you tell her?

A. I told her that since I had been robbed earlier or before I was working with the police officer to try to catch the people that had robbed me.

Q. So, you had been robbed before this?

A.    That's right.

....

Q.    You said you were working with the police to -- based on an incident that happened before this, right? Is that what you told us?

A.    That's right.

Q.    So, you told her that this was about the cell phone?

A.    That's right.

Q.    And that's all you have ever told her about this case is that this case -- the reason why you're getting the letters is because of this about the cell phone that was stolen from you prior to this incident?

A.    No.

Q.    Okay. What else have you told her?

A.    She found -- she found out about what had happened on Facebook.

Q.    On Facebook?

A.    That's right.

Q.    Someone put on Facebook about this incident? Are you talking about like a newspaper article she read?

A.    That's right. His picture was there; and so, that's the reason why she knows that he goes to the store where she works.

Q.    No, my question is this: I mean, did you describe to her any of the events of that night?

A.    In time she started learning about it, and I had to start telling her.

Q.    So, yes, you have told her details of events of that night?

A.    She asked me, and I look at her --

THE INTERPRETER: Oh, correction. She asked me, and I deny it.

Q.    (By [Defense Counsel]) ... [T]his is a simple question. Have you at any point in time discussed with your wife the incident and the details of the incident?

A.    No.

Q.    And when she finds it on the newspaper article about it and confronts you about it, you told her that's a lie?

A.    That's right.

Q.    What part? I mean, that it was a lie that it's in the newspaper or a lie that you were robbed; or what part did you tell her was a lie?

A.    That I was going to go meet with two prostitutes.

Q.    You just -- you deny that part to her, and you said that part's a lie? That's the only part that's a lie?

A.    That's right.

Q.    But if I recall that newspaper article, it described you as being in the vehicle with another woman, correct?

A.    I didn't read the newspaper article. My wife explained that to me, and I believe so.

Q.    All right. So, you have denied that you were anywhere around that -- that part of this story that has been in the newspaper, you told your wife -- denied the fact that you were around any women that night?

A.    That's right.

Q.    So, you told your wife it's a lie when it comes to the fact that there's women involved in this case?

A.    That's right.

At the conclusion of Flores's testimony, Tello's counsel again brought up questioning Flores's wife, and the State re-urged its relevance complaint. At that point, the trial court informed the parties that it planned to proceed with the in-camera hearing and adjourned for the day.

The next morning, the State objected to any further questions by anybody regarding what communication was made between Flores and his wife, arguing that such communication was protected by the marital-communications privilege. The trial court sustained the State's objection. The trial court then told defense counsel to put his objection on the record, which he did as follows:

> [Defense Counsel]: Well, I mean, as to this case, just for the purpose of the record, that the victim -- alleged victim has testified that he at first did not tell his wife about this occurrence. Then, when some paperwork came from the D.A.'s office and she questioned him about that, he told her something, which I kind of followed yesterday about some cell phone that was stolen by somebody else prior to that. Then she confronted him with a newspaper article, which according to him, it was a Facebook or newspaper article that described this incident.
>
> ....
>
> [Defense Counsel]: Per the Court's ruling yesterday that was going to allow the in-camera questioning of her, I was asked to submit some -- the questions that I wanted, which --
>
> THE COURT: I've changed my mind. I'm not going to do that.
>
> [Defense Counsel]: I understand that; but for purposes of the record, I'm going to read them into it.
>
> THE COURT: Yes, sir. Go right ahead.

[Defense Counsel]: I sent an e-mail to the Court as well as [Prosecutors] at --

THE COURT: Why don't you just introduce a copy of them, and that will be marked Court's Exhibit Number 1 for purposes of appeal, copies of your --

[Defense Counsel]: My problem is there's not an attachment of the newspaper article on this that I sent the Court. I'll have to read that into the record.

THE COURT: You can read that.

[Defense Counsel]: But he testified up here on the stand that he was -- she confronted him about some newspaper article, which I searched and searched; and the only one I could find does not have his name on it. So, I don't know how she ever came to that conclusion that was him.

But he stated that at that point that -- mentioned about prostitutes and stuff, he said -- told her it was a lie.

And I had him -- of course, I don't know what newspaper article she's referring to because I can't ask her what article it was. I don't know what part he's saying is a lie and not a lie.

And, Judge, I mean, as to his credibility, as to basically his word stating that this happened, he is flimflamming around up here about what he told his wife about it, trying to explain it. I think that he has waived his -- any kind of marital privilege that the State asserts he has by making the statement.

The State did not object to it. It's not the Court's duty to object to it. It's the State's. They're the ones -- I mean, same as, you know, if I allowed hearsay in, I mean, by some witness that's not my client. Well, it's not the Court's duty to say, 'Well, you can't say that because it's hearsay."

I think this is a violation of my Defendant's right to due process and compulsory process. The witness -- as outlined in *Coleman*, 966 S.W.2d, the Defendant's entitled to the Sixth Amendment to present a defense, the right to present the Defendant's version of the facts and as well as the Prosecutor has that right so the jury may decide where the truth lies.

And if the Defendant can make a plausible showing to the trial court, even though if he's not had the opportunity to interview the witness, which I have not. I'm being denied that because I can't get a telephone number, location, anything.

You know, I'm going to establish matters that that witness might testify to. She might testify that he told me it was all a farce. He told me, "Nothing ever happened," which obviously would be -- hold great weight with the jury.

He might have told her, "Well, yeah, I did. I was unfaithful. I was -- you know, I had consensual sex with these people. They didn't rob me." I don't know what he's going to say.

But I, also, on one thing, the spousal communication protects communications, if it does apply in this situation. It doesn't protect acts. And as to her testifying if she was unfaithful to him, that's not a communication. That's an act.

And his testimony up here was the first time I heard it, that, "Well, I was dealing with her being unfaithful to me." It sheds a light on him that it's okay what he's doing; and I think that that has -- the Defendant has a right to go into that; and the Court is denying me that as well.

And so, under due process, Sixth Amendment, as well as I believe the Court is wrong as to Rule 505 [sic]. I believe the State has waived that and this case -- the Bruni case that I presented to the Court clearly states that that's not something you can go back and later claim after the testimony has been out there.

THE COURT: All right. That will be your objection for the record.

[Defense Counsel]: And I need to read in the article.

THE COURT: All right.

    ....

[Defense Counsel]: ....
The attachment which I need -- I'll put the e-mail in here. The attachment to the e-mail -- there was two attachments. One of them being an article from "The Eagle" on May 18th, 2012, entitled "Man Duped by Prostitute and her Friend Report States."

It says: Bryan man recently told police that he wondered if he was set up by a possible prostitute trying to find him a, quote, unquote, date led him to a parking lot where he was robbed at gunpoint. The incident happened just before 9:00 p.m., May 4th, in the 2900 block of West 28th Street, when the man said he made a deal with the woman after rejecting her offer for services, the court document states. She climbed into his car and told him she could set him up with another woman, but

once a few blocks away, all the driver saw was a car with another man approaching, the document states.

"Later the driver told police that he thought something was strange, but it wasn't until he was waiting for the police that it occurred to him that he was likely setup. The woman, who twice put the car in park when the driver tried to leave the lot, rolled down her window as the second man approached and ordered the driver to give his wallet with $1,000 in it and his cell phone, the police report states.

"The driver complied and the man, along with the prostitute, jumped into the car and sped away, the police said. The victim quickly called police from a nearby store.

"It was at the convenience store that detectives reviewed surveillance video and through a brief investigation learned the identity of the woman and the man. Warrants were issued for the arrest of Robert Guzman Sierra, 26, and Araceli Tello, 36. Both were taken into custody Wednesday on charges of aggravated robbery which is a first degree felony."

Which as that article -- there's a lack of any Leobardo Flores, even though Mr. Flores said that that was -- his wife confronted him about an article, and my understanding was he said a newspaper article, so --

THE COURT: All right. Are you going to introduce a copy of your questions?

[Defense Counsel]: Yes, sir.

THE COURT: And that will be marked Court's Exhibit 1 for purposes of appeal.

**(Court's Exhibit No. 1 offered and admitted.)**

Court's Exhibit No. 1 provided the following questions to be propounded to Flores's wife:

1. Do you recall ever receiving in the mail any documents in which your husband was referenced as being an alleged victim of Aggravated Robbery?

a) If so, **when** do you recall receiving such documents in the mail?

b) If so, did you at anytime question your husband as to why he was receiving such documents in the mail?

Tello v. State

c) If so, what was your husband's response?

2. Have you at anytime read a newspaper article, Facebook post, etc. that you believe described an incident in which your husband was the alleged victim of Aggravated Robbery?

a) If so, **when** do you recall reading this newspaper article, Facebook post, etc.?

b) If so, did this newspaper article, Facebook post, etc. specifically identify your husband by name as being an alleged victim of Aggravated Robbery?

c) If so, was what you read the same or similar to the article that was published on May 18, 2012 in the Bryan/College Station Eagle Newspaper? **See** *"Police: Man Likely Duped By Prostitute"* attached hereto.

d) If so, did you at anytime confront your husband concerning the information you had read in this newspaper article, Facebook post, etc.?

e) If so, what was his response to your questioning of him about the information you had read in this newspaper article, Facebook post, etc.[?]

d) [*sic*] In responding, did your husband specifically deny having contact with any female (prostitute or otherwise), as described in the newspaper article, Facebook post you read?

e) [*sic*] In responding, what amount of money did your husband claim was stolen from him?

3. Prior to May 4, 2012, had your husband ever accused you/discussed with you allegations that you had been unfaithful to him?

In her first issue, Tello contends that the trial court erred in ruling that she could not question Flores's wife as to what communications he had with his wife regarding the facts surrounding the alleged aggravated robbery. Tello argues that Flores waived any possible privilege that he held regarding these communications when he testified about what communications he had with his wife regarding the facts surrounding the

alleged aggravated robbery without objecting that the communications were privileged. Similarly, in her second issue, Tello contends that the trial court violated her Sixth Amendment right by denying her the ability to obtain any identifying information of a material witness (Flores's wife) in order to compel the witness's attendance to testify at trial. Even if the trial court erred, however, Tello was not harmed by such error. *See* TEX. R. APP. P. 44.2.

Based on Court's Exhibit No. 1, Tello first wanted to ask Flores's wife to what extent she had confronted Flores about the alleged aggravated robbery and about what he had told her in response. Before introducing Court's Exhibit No. 1, Tello explained:

> You know, I'm going to establish matters that that witness might testify to. She might testify that he told me it was all a farce. He told me, "Nothing ever happened," which obviously would be -- hold great weight with the jury.
> He might have told her, "Well, yeah, I did. I was unfaithful. I was -- you know, I had consensual sex with these people. They didn't rob me."

Any testimony by Flores's wife about what Flores told her about the robbery would, however, have been inadmissible hearsay. *See* TEX. R. EVID. 801, 802.

Furthermore, any testimony by Flores's wife about what Flores told her about the alleged aggravated robbery would not have been admissible for impeachment purposes as a prior inconsistent statement under Rule of Evidence 613(a). Rule 613(a) provides:

> In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement.... If the witness

unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted.

TEX. R. EVID. 613(a). Here, Flores readily admitted that what he told his wife was inconsistent with his testimony of what happened during the alleged aggravated robbery. Flores testified that he lied to his wife about the alleged aggravated robbery to hide the fact that he was soliciting a prostitute at the time he was robbed.

Finally, based on Court's Exhibit No. 1, Tello also wanted to ask Flores's wife if Flores had accused her or discussed with her allegations that she had been unfaithful to him. But any testimony by Flores's wife about such communication would have been irrelevant. *See* TEX. R. EVID. 401, 402.

Therefore, as stated above, even if the trial court erred, Tello was not harmed by such error. *See* TEX. R. APP. P. 44.2. Both of her issues are overruled, and the trial court's judgment is affirmed.


REX D. DAVIS
Justice


Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
        (Chief Justice Gray dissenting with a note)*
Affirmed
Opinion delivered and filed April 23, 2015
Do not publish
[CRPM]


*        (Chief Justice Gray dissents. A separate opinion will not issue. He notes however that this case turned on the credibility of Flores, the alleged victim. While testifying on cross examination Flores admitted he had lied to his wife about the events

resulting in the defendant's arrest and trial. The extent and scope of what Flores told his wife were restricted to what Flores was willing to admit. The defendant was effectively asked to believe Flores about what lies Flores had told his wife and to believe what he was testifying to was the whole truth at trial including what he had previously lied about when telling his wife. This calls to mind Professor Matt Dawson's (Baylor Law School's Practice Court Professor) famous cross examination question: Were you lying then or are you lying now? As argued by the defendant, for all we know Flores could have made up the story he was telling the police to continue to cover the lies he was telling his wife. Without the ability of the defendant to interview and possibly subpoena Flores's wife, the defendant was denied the ability to effectively investigate and pursue a defense directly involving Flores's credibility about the events at issue. What could be a more relevant source of material information to impeach the testimony of the State's star witness, the alleged victim, than the person to whom he told an entirely different story about the events. The trial court erred in refusing to require disclosure of the identifying information for Flores's wife.)



OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR
PRIVATE USE

U.S. POSTAGE PITNEY BOWES

ZIP 78701   $ 000.28
02 1W
0001401623 MAY 28 2015

**5/22/2015**

**TELLO, ARACELI**   Tr. Ct. No. 12-02891-CRF-272

**COA Case No. 10-13-00160-CR**

**PD-0610-15**

On this day, this Court has granted the Appellant's Pro Se motion for an extension of time in which to file the Petition for Discretionary Review. The time to file the petition has been extended to Friday, July 24, 2015. NO FURTHER EXTENSIONS WILL BE ENTERTAINED. NOTE: Petition For Discretionary Review must be filed with The Court of Criminal Appeals.

Abel Acosta, Clerk

ARACELI TELLO
TDC# 1855166
HOBBY UNIT
742 FM 712
MARLIN, TX 76661

Araceli Tello TDCJ# 1855166
Hobby Unit
742 FM. 712 2E214
Marlin, Texas 76661

Court
D.F.